William L. ROUSAN, Appellant,

v.

STATE of Missouri, Respondent.

No. SC 82406.

Supreme Court of Missouri,
En Banc.

May 15, 2001.

Rehearing Denied June 26, 2001.

578

Laura G. Martin, Asst. State Public Defender, Kansas City, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Stacy L. Anderson, Asst. Atty. Gen., Jefferson City, for Respondent.

WOLFF, Judge.

A jury found William L. Rousan guilty of two counts of first degree murder for the deaths of Charles and Grace Lewis. Section 565 .020.1. He was sentenced to life without parole for Mr. Lewis' murder and death for Mrs. Lewis' murder. He appealed, and this Court affirmed. *State v. Rousan (Rousan I)*, 961 S.W.2d 831 (Mo. banc 1998). Rousan's Rule 29.15 motion for post-conviction relief claiming ineffective assistance of counsel was overruled. He appeals the denial of his Rule 29.15 motion to this Court and raises fifteen points of error. This Court has jurisdiction. Mo. CONST. art. V, section 10. We affirm.

### The Facts and Trial Court Judgment

■ The facts must be viewed in the light most favorable to the verdicts. *State v. Shurn,* 866 S.W.2d 447, 455 (Mo. banc 1993), *cert. denied,* 513 U.S. 837, 115 S.Ct. 118, 130 L.Ed.2d 64 (1994). Since the standard under which we view the facts is the same as for a direct appeal, the facts of *Rousan I,* are adopted and summarized in this opinion.

On September 21, 1993, Rousan, his son, Brent Rousan, and Rousan's brother, Robert Rousan, met and discussed stealing cattle from Charles and Grace Lewis. Charles Lewis, 67, and his wife, Grace, 62, lived near the farm where Rousan resided. Having devised a plan, the Rousans set out for the Lewis farm. On the way they discussed killing Mr. and Mrs. Lewis. They agreed that "if it had to be done it had to be done."

As Rousan, Robert, and Brent drove past the Lewis farm, Rousan pointed out the cattle that they would be stealing. Rousan parked his truck approximately two miles from the farm. He got out of the truck and removed a .22 caliber rifle that belonged to his girlfriend, Mary Lambing. He loaded the rifle for use in the crime "in case anyone was home." Rousan and his son then argued over who

would carry the gun. Brent said that he was "man enough to do whatever needed to be done and that he would use the weapon." Rousan at first stated that Brent was not man enough, but eventually gave him the gun. He warned Brent that if they were caught, they would "fry." The three men then hiked through the woods to the Lewis farm where they waited under cover behind a fallen tree.

Between 3 p.m. and 4 p.m. that afternoon, Mr. and Mrs. Lewis returned home. Mr. Lewis began to mow the lawn. Mrs. Lewis spoke on the phone to the couple's oldest daughter, who called at approximately 4 p.m.

Brent grew tired of waiting and exclaimed that he wanted to "do it." Rousan told Brent to wait until Rousan and Robert had secured the house. Rousan headed for the front door and Robert made his way to the back door. Before they got to the door, Mr. Lewis saw Brent and called out. Brent fired at least six shots from the rifle, all of which struck Mr. Lewis. Mr. Lewis died as a result of the multiple gunshot wounds.

Mrs. Lewis, speaking by telephone with her daughter, told her daughter that she heard gunfire and hung up the telephone. As Mrs. Lewis exited the house through the front door, Brent shot her several times. Although the bullets fractured both of Mrs. Lewis' arms, the wounds were not fatal. Mrs. Lewis ran back into the house. Rousan followed her, removed a garment bag from a coat rack, placed the bag over Mrs. Lewis' head and the upper part of her body, picked her up, and carried her outside. When Rousan placed Mrs. Lewis on the ground, she was alive. Rousan turned to Brent and instructed him to "finish her off." Brent fired one shot into the left side of Mrs. Lewis' head. The shot killed her.

The three men wrapped the bodies in a tarpaulin and tied it with a rope. Rousan instructed that they should pick up the shell casings and clean up the blood stains. After doing so, the men deposited the bodies near a shed and left, planning to return later to get the bodies and the cattle.

The three men, along with Jerry Rousan, another of Rousan's brothers, returned to the Lewis farm that night. There they loaded the bodies into Mr. Lewis' truck. They took two cows, a VCR, jewelry, soda, two gas cans, and a saddle. The four men then returned to Mary Lambing's farm, where Rousan lived. On the return trip, Brent bragged about the murders. At the Lambing farm, the men buried Mr. and Mrs. Lewis in a shallow grave by the barn. After digging the grave and placing the bodies in it, the men poured concrete over the bodies. They covered the grave with a pile of manure. They burned rags used to clean the blood from the Lewis house.

The men disposed of the Lewises' property in various ways. On the night of the murders, the men consumed the soda. The cows were later sold at auction. Robert Rousan gave the VCR to his sister and brother-in-law, Barbara and Bruce Williams, on the day following the murders. Mr. and Mrs. Williams sold the VCR to a local pawnbroker approximately eight months later. Rousan buried the couple's personal items. He gave the remainder of the jewelry to Mary Lambing on special occasions during the following year. The four men hid and later burned Mr. Lewis' truck.

Rousan, armed with a .22 caliber rifle, was arrested at the barn without incident. He was taken to the Washington County sheriff's department. There, the officers advised Rousan of his *Miranda* rights and questioned him.

Rousan provided information that implicated himself in the murders. He told the police that he had first met the victims in 1975. He saw them again in 1989 after he escaped from custody in the State of Washington and sought refuge at their farm. When Mr. Lewis discovered Rousan hiding in his barn, Mr. Lewis fed him, clothed him, and when Rousan left the farm two weeks later, Mr. Lewis gave him twenty dollars. Shortly after that time, Rousan was apprehended and returned to prison.

After release from prison in June of 1993, Rousan returned to the farm to thank Mr. and Mrs. Lewis for their kindness and to rekindle their friendship, he said. According to Rousan, Mrs. Lewis was in poor health. Rousan explained that Mr. Lewis asked Rousan to kill Mrs. Lewis to put her out of her misery, and to kill him because he did not want to live without his wife. Rousan also claimed that he was hired by Charles Lewis, IV, son of Mr. and Mrs. Lewis, to kill them in exchange for fifty-thousand dollars. Rousan maintained, however, that his actual motivation for the murders was mercy.

The police discovered the Lewises' bodies at Mary Lambing's farm. They also discovered the murder weapon and various articles of the Lewises' personal property there. Rousan was charged with the murder of Charles and Grace Lewis.

The jury found Rousan guilty of two counts of first degree murder. At the penalty phase, the state introduced evidence of Rousan's prior convictions for rape, assault, escape, and unlawful possession of a firearm. In addition, the state presented testimony from family members of Mr. and Mrs. Lewis with respect to the impact of their deaths on the family. Rousan presented testimony of friends and family members in mitigation of punishment.

The jury found five statutory aggravating circumstances with respect to Grace Lewis' murder and recommended that Rousan be sentenced to death. The jury also recommended that Rousan be sentenced to death for the murder of Charles Lewis. The jury found four statutory aggravating circumstances with respect to his murder. The trial court sentenced Rousan to death for the murder of Grace Lewis and life imprisonment without the possibility of parole for the murder of Charles Lewis. This Court affirmed on direct appeal. Thereafter, Rousan filed a timely Rule 29.15 motion in the trial court for post-conviction relief. He claimed his attorneys, Richard Scholz and Robert Wolfrum, were ineffective. The court appointed counsel and held a hearing on Rousan's claims. On December 28, 1999, the circuit court overruled his motion.

### The Standard of Review

■ This Court's review is limited to determining whether the motion court clearly erred in its findings and conclusions. Rule 29.15(k); *State v. Wise*, 879 S.W.2d 494, 524 (Mo. banc 1994), *cert. denied*, 513 U.S. 1093, 115 S.Ct. 757, 130 L.Ed.2d 656 (1995). The findings and conclusions of the motion court "are clearly erroneous only if, after a review of the entire record, the appellate court is left with the definite impression that a mistake has been made." *State v. Parker*, 886 S.W.2d 908, 929 (Mo. banc 1994), *cert. denied*, 514 U.S. 1098, 115 S.Ct. 1827, 131 L.Ed.2d 748 (1995).

■ With respect to claims of ineffective assistance of counsel, the burden is on the claimant to prove that his counsel's performance "fell below an objective standard of reasonableness" and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."

*Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To prove prejudice, Rousan must show that there is a "reasonable probability that, but for counsel's errors, the result of the proceeding would have been different." *Shurn,* 866 S.W.2d at 468 (quoting *State v. Ervin,* 835 S.W.2d 905 (Mo. banc 1992), *cert. denied,* 507 U.S. 954, 113 S.Ct. 1368, 122 L.Ed.2d 746 (1993)). A reasonable probability, under *Strickland,* is "a probability sufficient to undermine confidence in the outcome." 466 U.S. at 694, 104 S.Ct. 2052.

### Rousan's Claims of Ineffective Assistance

#### I.

Some of Rousan's points on this appeal raise his trial counsel's failure to call certain witnesses. A decision not to call a witness is presumed trial strategy unless clearly shown to be otherwise. *State v. Clay,* 975 S.W.2d 121, 143 (Mo. banc 1998), *cert. denied,* 525 U.S. 1085, 119 S.Ct. 834, 142 L.Ed.2d 690 (1999). Such strategic choices, if made after thorough investigation, are virtually unchallengeable. *State v. Kenley,* 952 S.W.2d 250, 266 (Mo. banc 1997), *cert. denied,* 522 U.S. 1095, 118 S.Ct. 892, 139 L.Ed.2d 878 (1998); *State v. Ramsey,* 864 S.W.2d 320, 340 (Mo. banc 1993), *cert. denied,* 511 U.S. 1078, 114 S.Ct. 1664, 128 L.Ed.2d 380 (1994). To prove ineffectiveness with regard to death penalty sentencing, Rousan must show that, but for his counsels' ineffective performance, there is a reasonable probability that the jury would have concluded after balancing the aggravating and mitigating circumstances, death was not warranted. *Kenley,* 952 S.W.2d at 266.

Rousan first contends that counsel Wolfrum and Scholz were ineffective because they failed to present his past records from the Federal Bureau of Prisons, the Washington department of corrections, and the Garrett Heynes educational center of the Washington department of corrections during the penalty phase. He claims that because these records show he was a great worker, good student and a well-behaved prisoner, the jury would have given him a life sentence. Specifically, they show he did not receive conduct violations in the Washington department of corrections, and while in the federal prison system, he was not viewed as a management problem. The prison records demonstrate that he worked in the vocational horticulture program and received outstanding evaluations from his supervisor, Grover Glance. He claims this information would have shown the jury that he was capable of adjusting to prison life and, thus, would not be a threat to others such that the jury would have recommended a sentence of life without parole.

Defense counsel Scholz testified that the records were not introduced because many of the documents contained information that was not beneficial to Rousan. The information included his use of a knife to rape and assault Vicki Mohrenweiser, his former girlfriend, and other details regarding the assault; his arrest for a charge of felony fraud, that due to an attempted escape he was placed in administrative segregation for 56 days pending the investigation of the incident; that he had dug himself out of the Washington pre-release center when he escaped rather than merely walking away as counsel argued at his trial, that prison authorities labeled him a "violent offender," and that his escape history indicated a "pattern of irresponsibility." The documents show that after his escape from the Washington pre-release center, he came looking for Mohrenweiser, made threatening calls to his ex-wife in Texas stating he was on his way to Texas to hurt her, was charged with felony bur-

glary, and that he was the prime suspect in three arson fires involving his ex-in-laws' home, his mother's home, and utility barns owned by his uncle.

Defense counsel did call six witnesses during the penalty phase. John Tweedie, Rousan's junior high and high school cross country and track coach, testified that Rousan was quite dedicated. He also testified that Rousan was a hard worker when they went into a failed drilling business together. Paul Fitzwater, a former track mate and friend, testified that he was a leader on the track team, that people looked up to him, and that when Rousan returned to Potosi he attended track meets and encouraged the runners. The Texas department of protective and regulatory services records, which were introduced by defense, showed that he was awarded custody of his children when his wife was not found to be properly taking care of them, and that he provided a safe environment for them as well as good child care. Mary Lambing, the woman he lived with in Potosi, testified that he worked very well with her horses, that he encouraged her to go to college, and worked so she could attend college full time. Reverend Larry Walburn, who visited with Rousan after his arrest in this case, stated that the once bitter Rousan had been spiritually changed. Paul Rousan, Rousan's brother, testified about Rousan's upbringing and the family's problems.

■ There is no absolute duty to present mitigating character evidence. *Clemmons v. State*, 785 S.W.2d 524, 528 (Mo. banc 1990), *cert. denied*, 498 U.S. 882, 111 S.Ct. 229, 112 L.Ed.2d 183 (1990). The introduction of evidence and selection of witnesses are matters of trial strategy. *Kenley*, 952 S.W.2d at 266.

Rousan did not clearly show that the failure to introduce these records was not reasonable trial strategy. The records clearly contained information about his past misconduct and convictions that went beyond that which the jury heard at voir dire. The introduction of such misconduct could have been prejudicial to Rousan, as "[t]o the average juror ... unconvicted criminal activity is practically indistinguishable from criminal activity resulting in convictions...." *State v. Debler*, 856 S.W.2d 641, 657 (Mo. banc 1993). Thus, defense counsels' decision not to introduce such non-beneficial items cannot be said to be anything other than reasonable trial strategy.

## II.

■ Rousan claims ineffectiveness based on his counsels' failure to call Timothy Sander, Rousan's former employer, during the penalty phase. Sander was subpoenaed but never called by defense to testify. He would have testified that he had co-owned East Central Forest Products and that Rousan worked for him for about six months starting in October 1993. Sander would have told the jury that he had a hard time finding good help, but that he thought Rousan was "an 'A' plus worker," was highly regarded by other workers, and was never a problem. However, he would also have testified that Rousan told him he had been convicted of crimes, but that the convictions were for escaping from a Washington prison and transporting a horse across a state line, and that Rousan had not mentioned any priors for sexual assault. Sander would also have testified that he gave production bonuses to workers who produced a certain amount each week, and who contacted him when missing a day of work. Those employees who did not call did not receive a bonus. According to Sander, one week Rousan missed work without calling in, Sander offered to let him make up the work on Saturday so he could get the bonus, but

Rousan did not show up. On payday, Rousan got angry with Sander when he did not receive a bonus, and Sander told him there had been an opportunity to make up the work he missed. Rousan quit his job the following week. Sander would have testified that he did not feel threatened when Rousan came to his house to pick up his last pay check, but that he could tell something was bothering Rousan. Lastly, he would have stated that he offered to hire Rousan again, and that while he was waiting for an opening, Rousan filled in about two or three times for other workers.

Rousan notes that counsel presented evidence of his concern for his children, the positive influence he had on his current girlfriend Mary, his deprived childhood, and his high school years to counter the state's evidence. However, he claims that his work ethic needed to be shown to the jury as a mitigating circumstance, as it would have shown the jury that he could have made a good adjustment to life in prison by continuing to be a hard worker, and this would have given the jury a reason to impose a life sentence.

Rousan has failed to show the motion court clearly erred in finding that counsel made a reasoned decision in not calling Sander during the penalty phase. The record shows that defense counsel contacted Sander before trial and had an investigator meet with him. Scholz testified that the fact that Sander would testify that Rousan lost his temper when he was fired was one consideration in not calling him. Additionally, the fact that Sander would testify that he did great work for him, which was right after the murder of Mr. and Mrs. Lewis, would probably have weighed against him as well. Sander also had been convicted for armed robbery, making his testimony less credible. Lastly, there is no logical inference that equates working well with adjusting to

prison life. Thus, this mitigating evidence does not make it probable that the jury would have found that death was unwarranted. Rather, all these circumstances demonstrate that Sander was not called as part of defense counsels' reasonable trial strategy.

### III.

■ Rousan next argues that his counsel failed to properly object to the state's penalty phase closing argument in which the prosecutor stated:

> ... The question here when we really come down to it, there is a lot of things I could say but I won't, is that we need to deal with this from the standpoint of what is necessary to protect the community and I say the community, I mean I'm talking about our community as a whole, our state as a whole or whatever. The defendant is going to be removed from the community, yes, but he's going regardless of what you sentence him to, life in prison without the possibility of probation or parole, if you sentence him to that he is going to a prison. There are people in those prisons who go there every day from home and go home every night. So, yes, there is a possibility still that this man could have access to people from the outside. They deserve to be protected. We know this man has participated in ever-increasing spiral of violence....

The motion court found that an objection to this statement would have been unmerited. However, Rousan contends that the prosecutor can only rightfully make this type of statement when the defendant kills someone while he is incarcerated. *State v. Antwine*, 743 S.W.2d 51, 71 (Mo. banc 1987), *cert. denied*, 486 U.S. 1017, 108 S.Ct. 1755, 100 L.Ed.2d 217 (1988).

■ The state points out, however, that the prosecutor's statement came in

response to the defense argument that society would be protected from Rousan if the jury sentenced him to life in prison.[1] "A defendant may not provoke reply to his own argument and then assert error." *State v. Kreutzer*, 928 S.W.2d 854, 875–76 (Mo. banc 1996), *cert. denied*, 519 U.S. 1083, 117 S.Ct. 752, 136 L.Ed.2d 689 (1997). The prosecutor is allowed to retaliate when defense counsel argues that "a sentence of life imprisonment without the possibility of parole would 'protect society.' " *Id.* Here, the prosecutor was responding that the defense's statement was not necessarily true, as members of society, such as people who worked at the prison, would still come in contact with Rousan. The motion court did not err.

## IV.

Rousan also contends that his counsel was ineffective for failing to call him to testify during the guilt phase of his trial. He testified at his Rule 29.15 hearing that he told Scholz numerous times that he wanted to testify and that it was always his understanding that he would testify. He stated that he asked for a recess toward the end of the guilt phase because he and Scholz were having a disagreement about him testifying. Rousan stated that he and Scholz had a heated conversation in the back of the courtroom, where Scholz told him testifying could create problems, but Rousan maintained that he wanted to testify. He stated that Wolfrum came back and said they were being loud, at which point Scholz left, and Rousan told Wolfrum that he wanted to testify.

Wolfrum testified at the Rule 29.15 hearing that he did not remember whether Rousan wanted to testify. But Scholz remembered their conversations, and stated that, though he advised against it, Rousan wanted to testify at his trial. Rousan's prior convictions were brought up during voir dire for a couple of reasons, one of which was in case Rousan testified. Scholz testified that at some point Rousan told Wolfrum at the counsel table that he had changed his mind and did not want to testify. Wolfrum relayed this message to Scholz, who breathed a sigh of relief and went on.

 The decision to testify solely rests with the defendant, but the defendant is entitled to receive "reasonably competent advice." *State v. Dees*, 916 S.W.2d 287, 301 (Mo.App.1995), *cert. denied*, 519 U.S. 857, 117 S.Ct. 157, 136 L.Ed.2d 101 (1996). Without more, advice from counsel not to testify is not deemed ineffective assistance of counsel if it might be considered sound trial strategy. *State v. Powell*, 798 S.W.2d 709, 718 (Mo. banc 1990), *cert. denied*, 501 U.S. 1259, 111 S.Ct. 2914, 115 L.Ed.2d 1077 (1991). The motion court did not clearly err in determining that Rousan, on the advice of counsel, decided not to testify. This conclusion is supported by the testimony. Rousan's testimony and Scholz's testimony conflict as to whether Rousan wanted to testify. The motion court is entitled to believe counsel's testimony and disbelieve that of the defendant. *State v. Loggins*, 778 S.W.2d 783, 791 (Mo.App.1989); *State v. Feltrop*, 803 S.W.2d 1, 20 (Mo. banc 1991), *cert. denied*, 501 U.S. 1262, 111 S.Ct. 2918, 115 L.Ed.2d 1081 (1991).

1. The defense stated that killing Rousan would not bring back the Lewises and that the jury had to consider the purposes of punishment, including the "the purpose to protect society," which the defense stated would be accomplished by putting Rousan in jail. To prove its point that society would be protected by Rousan being in jail, defense counsel stated that "he won't walk away from Jeff City walls or he won't walk away from Potosi Correctional Center, it's not a pre-release farm or anything."

■■■ Would the outcome of the case been different had Rousan testified? Rousan would have testified that there was no premeditated plot to kill the Lewises. He went to the farm with his brother and son to steal cattle. When they arrived at the farm, Robert took out the .22 rifle that was in the truck, and Rousan grabbed a lariat, three halters, and three lead ropes. They did not see any cattle until they were sitting on a fallen tree behind the Lewises' barn and seven young calves walked by. At this point Rousan told the two others they were not going to take any because the cattle would be missed. They started to leave just as a lawn mower started. Rousan was walking in front of Brent and Robert when Brent took the gun Robert was holding and said he was not going to leave without getting something. Brent then shot at Mr. Lewis, who was on the lawnmower. Rousan and Robert then proceeded to the Lewises' house to prevent anyone else from being killed. Rousan instructed Robert to go through the front of the house, and Rousan went in the back. When Rousan saw Robert, Robert informed him Mrs. Lewis had gone out the front door.

At this point, Rousan looked out the front door to find Mrs. Lewis coming toward the front door steps, moaning and holding her bloody arms at her side. She climbed up the steps and collapsed on the porch. Rousan went into the house, found a clothing bag, and wrapped it around her body. He then carried her down the stairs where he placed her on the ground with a pillow behind her head. At this point Rousan would have testified that she was not breathing and had no pulse, so he began CPR.

Robert then yelled that there was smoke coming from the barn. Rousan stopped working on Mrs. Lewis because he could not get a pulse and went with Robert to see what was going on. When they arrived at the barn they found Brent trying to reload the gun. Rousan would have testified that Brent was shaking and scared. Rousan asked him to give him the gun, but he refused and continued to reload it. Rousan tried to get the gun back by telling Brent that Mrs. Lewis was really hurt so either he or Brent needed to finish her off. Rousan would have testified that he never intended to harm Mrs. Lewis and merely wanted to get the gun away from Brent, as he feared Brent might shoot him or Robert. However, Brent would not budge. So, he instructed Brent to stay put, and he and Robert returned to the house. When they returned, Rousan began cleaning the blood off the steps. He put Mrs. Lewis, who he thought was dead, under an oak tree and then went to the basement looking for paint to cover the blood on the steps. While this was occurring, Brent came up to the house and shot Mrs. Lewis because he thought she was moving. Rousan stated that Sergeant Crump told him during questioning that his son Brent would probably be on death row because they knew he was the shooter. He claimed his first statement to the police, inconsistent with this statement, was fabricated to help Brent avoid the death penalty. Rousan also made statements about knowing Antonio Salazar and Ron McKinney, who he claimed were in the drug trade, when in fact Salazar was one of his prior attorneys, and McKinney was a man he had been incarcerated with in Washington.

Rousan has not proved he was prejudiced by his failure to testify. There is not a reasonable probability that if he would have testified the result of the proceeding would have been different. *State v. Shurn*, 866 S.W.2d 447, 468 (Mo. banc 1993), *cert. denied*, 513 U.S. 837, 115 S.Ct. 118, 130 L.Ed.2d 64 (1994). Rousan's testimony would have been subject to im-

peachment due to its inconsistency with his confession to police—in his confession he said he went to the farm to kill the Lewises after Mr. Lewis had requested that he kill them.

## V.

Rousan next contends that defense counsel was ineffective because they failed to call his son Brent to testify during the guilt phase of the trial. According to Rousan's Rule 29.15 motion, Brent would have provided a defense for him, as Brent would have testified that they went to the farm just to steal cattle, and that Rousan did not kill nor encourage Brent's killing of the Lewises. Rousan contends that Brent wanted to testify for him, that his counsel did not call him, and that their failure to call him was not trial strategy.

■ As noted, a decision not to call a witness is presumed trial strategy unless clearly shown to be otherwise. *Clay*, 975 S.W.2d at 143.

■ Moreover, Rousan has not established that Brent would have testified. Though Brent stated in his deposition that he would have testified, Scholz testified that he met with Brent for about fifteen minutes, and that at no time did he want to testify. Though there is a conflicting story, the motion court was allowed to accept Scholz's testimony and disbelieve Brent's. *State v. Kelley*, 953 S.W.2d 73, 93 (Mo.App.1997). When defense counsel believes a witness' testimony "would not unqualifiedly support his client's position, it is a matter of trial strategy not to call him to the stand, and the failure to call such witness does not constitute ineffectiveness of counsel." *Murphy v. State*, 768 S.W.2d 171, 172–73 (Mo.App.1989).

■ Rousan did not establish that counsels' failure to call Brent was other than reasonable trial strategy. If Brent

would have testified, his credibility would have been diminished, and according to Scholz, he would not have been a believable witness. This was based on the fact that during his plea hearing he directly contradicted the story he would have testified to during Rousan's trial, and as Scholz claimed, it "locked in William's participation in the case." Brent's post-conviction hearing testimony contradicted what he said during taped statements to police, most of which were not favorable to Rousan. For instance, Brent claimed at one point that Rousan put a bag over Mrs. Lewis' head and told him to shoot her in the head. During his first taped statement to police, Brent stated that Rousan shot Mr. Lewis three times, threw him the gun, and told him to finish it. At the plea hearing, he again stated that Rousan fired a couple shots, then threw him the gun, and told him to finish it. At the plea hearing Brent also testified under oath that he fired at Mrs. Lewis a few times, but that Rousan was the one who fired the shot that actually killed her. Brent admitted via deposition, at Rousan's post-conviction hearing, that his current testimony contradicted what he said at his plea hearing and stated that he lied at the plea hearing.

Rousan failed to show that Brent's testimony would have provided a viable defense. As Scholz testified, Brent would have been called if he would have "saved his father (Rousan) from culpability in the shooting." However, if Brent testified, it clearly would not have helped Rousan and would actually have damaged his defense. Brent probably would have been impeached as to his contrary statements to the police and at his plea hearing. Additionally, his statements implicated Rousan as being the killer of both Mr. and Mrs. Lewis. It is clear that not calling him was nothing other than reasonable trial strate-

gy. *Pullen v. State,* 895 S.W.2d 253, 255 (Mo.App.1995).

## VI.

Rousan alleges the motion court clearly erred in denying his Rule 29.15 motion because his counsel was ineffective for failing to present evidence of Rousan's attorney request form. Before trial a suppression hearing, in which Rousan did not testify, was held. The state's evidence showed that Rousan was arrested and made a statement at the Washington County jail. He was advised of his *Miranda* rights by Sheriff Bulloch while en route to the jail. Rousan indicated he understood his rights. Rousan was advised not to make any statements until arrival at the jail, and did not in fact make any statements until he arrived.

After arrival at the jail, Rousan was placed in the sheriff's office but was not questioned until Sergeant Joseph Crump arrived. At this point, Sergeant Crump advised Rousan of his *Miranda* rights, and Rousan told Sergeant Crump that he understood his rights. Sergeant Crump asked Rousan if he was willing to talk at that time, and Rousan said he was. Rousan indicated to Sergeant Crump that he was a part of the murders and could show him where the bodies were located. A little while later, Sergeant William Conway joined the interview. He and Sergeant Crump questioned Rousan for about one and a half hours, but the interview was not recorded. A break was taken and the officers asked Rousan to make a recorded statement, which Rousan agreed to do. At the beginning of his statement, Rousan was again reminded of his rights, and he stated on tape that he knew he could quit the conversation whenever he wanted to.

There was no evidence presented at the suppression hearing that Rousan requested an attorney at any time.

Rousan contended, however, in his amended post-conviction motion and at his Rule 29.15 hearing that he was taken to a cell and that when he arrived at the jail he asked Deputy Gilliam for an attorney request form. He stated that he completed the attorney request form,[2] gave it to Deputy Gilliam and Deputy Nicholson before going to the sheriff's office, then informed Sergeant Crump about the form, and that he did not want to talk. But he eventually gave a statement. He further stated at his next court appearance that he saw the deputies give the form to Wendy Wexler, an assistant public defender, that he discussed the existence of the form with his counsel, and that the form was in his trial counsel's possession during voir dire in Greene County. Rousan then testified that he brought this issue up to his direct appeal attorney, Elizabeth Carlyle, who looked through all the trial attorneys' files but could not find the form. Carlyle then testified that when she could not find the form in the files she had received, she contacted trial counsel to make sure they had given her all the files, but she received no more files.

Wolfrum did not remember any discussion about an attorney request form, could not find it in his files, and did not recall receiving it in Greene County. He did state, though, that he would have asked the trial judge to re-open the suppression hearing if the issue came up after the suppression hearing. Scholz remembered Rousan referring to signing a form for an attorney, but stated that Rousan did not describe the form well. He stated that he made numerous efforts to find the form

---

**2.** He testified that the attorney request form asked for his name, address, social security number, financial status, and where he worked. He noted that it also asked if he was indigent, and whether he needed an appointed attorney to represent him.

and find out what happened when he was arrested. Scholz noted that forms for a defendant to request public defender representation are available through the prosecutor, sheriff, and public defender, and that the indigency application asks about finances and whether the defendant wants to invoke his right to silence and be represented by an attorney. Additionally, Scholz testified that something new was brought into court by Wolfrum in Greene County, but he did not remember what the item was. He thought it concerned witness Samuel LaFrank, and stated that if it would have been the form Rousan was referring to, he would have litigated the issue vigorously before the court. Counsel could not find the form during direct appeal, and Rousan failed to produce the form at the post-conviction hearing.

 The motion court found this allegation was not supported by credible evidence. The motion court did not clearly err, as the above testimony fails to present credible evidence that an attorney form was actually filled out. None of Rousan's counsel could find the form, and Rousan could not produce it at his post-conviction hearing. The only evidence presented at the post-conviction hearing was the conflicting testimony of Rousan and his counsel, Wolfrum and Scholz. The motion court was free to disbelieve Rousan's claim that he requested an attorney prior to questioning, as a witness' credibility is the motion court's responsibility in a post-conviction matter. *Sage v. State,* 978 S.W.2d 489, 490 (Mo.App.1998). Additionally, the absence of any other evidence allowed the motion court to conclude no such form existed. *State v. Landers,* 969 S.W.2d 808, 812 (Mo.App.1998).

## VII.

Rousan claims the motion court clearly erred in quashing his subpoena of the Mis-

souri State highway patrol disciplinary files of Sergeant Conway and Sergeant Crump, in failing to review the records *in camera,* and in denying his Rule 29.15 motion. He claims that he made a plausible showing of misconduct by the officers, in that the officers disregarded his request for an attorney. He claims he was prejudiced because the credibility of the officers is an important issue in felony cases, and he was unable to establish a basis for his trial counsels' ineffectiveness without these records. He claims Wolfrum and Scholz were ineffective for failing to present the files.

Wolfrum testified at the Rule 29.15 hearing that generally the background of the officers is not explored in the investigation of a homicide. He did not remember Rousan speaking of any problem with the police. He also believed that there can be problems with the admissibility of such matters as they may be deemed irrelevant. Scholz did not remember Rousan ever asking that an investigation of Sergeant Crump and Sergeant Conway be conducted. Scholz testified that he was unaware of anything that indicated a history of improper actions by the officers other than being officers getting statements out of defendants. Scholz stated that the defense theory was not that the officers had beat or improperly forced Rousan to confess, and there was nothing else that indicated anything in Rousan's case or in the officer's history that made their personnel records relevant.

The motion court found that Rousan did not make a sufficient showing as to the relevancy of the officers' backgrounds, sustained the motion to quash, and refused to review the records *in camera.* The court found that the evidence presented at the hearing refuted Rousan's allegation that his counsel were ineffective.

Rousan's trial counsel could only be deemed ineffective if these records would have been admissible at trial. Rousan claims the state had a duty to disclose the files under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and *United States v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), because they contained impeachment and exculpatory evidence within the scope of the cases. In *Brady,* the United State Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violated due process where the evidence is material either to guilt or punishment." 373 U.S. at 87, 83 S.Ct. 1194. This holding applies not only to exculpatory evidence, but also to impeachment evidence. *Bagley,* 473 U.S. at 676, 105 S.Ct. 3375. In order to be entitled to such information, a defendant must make a plausible showing as to how the information would have been material and favorable to him. *State v. Parker,* 886 S.W.2d at 916–17.

▬▬▬ The files did not contain information about the officers actions with regard to Rousan's case. Rousan failed to show how the personnel files would be material to his guilt or innocence, as there was no showing how the officers' past personnel files would relate to their actions in this case and the records did not relate to his guilt or innocence. Additionally, the records could not have come in to impeach the officers, as it is a general rule of evidence that "[s]pecific acts of misconduct not resulting in a conviction may be inquired about on cross-examination if they relate to the truth and veracity of the witness, but may not be proved by extrinsic evidence." John C. O'Brien, Missouri Law of Evidence § 5–7 (3d ed.1996). The motion court did not clearly err, as the records were not admissible for impeachment purposes.

## VIII.

▬▬▬ Rousan next argues that counsel were ineffective because they failed to move to have references to his prior convictions for assault, rape, unlawful use of weapon, and escape redacted from the recorded confession he made to the police. He claims that this prejudiced him because it had no legitimate tendency to prove he was guilty of first degree murder, and its only purpose was to inflame the jury.

Rousan claimed Mr. Lewis asked him to kill Mrs. Lewis to put her out of her misery and that Mr. Lewis wanted to be killed because he could not live without his wife. Rousan also claimed that he was hired by their son, Charles Lewis, IV, to kill them in exchange for $50,000. Rousan continually maintained, however, that his actual motivation for the murders was mercy. In his confession to the police he interjected references about his prior convictions and misconduct without any cajoling by the police. He believed if he did not testify, his prior convictions would not come out during the guilt phase. Though he did not testify at trial, the state introduced as evidence the tape of his confession with no omissions. Defense counsel requested that the part of Rousan's confession relating to running drugs be redacted, but this request was overruled.

The motion court found that Rousan could not have suffered prejudice by counsel's failure to redact his comments on prior crimes as the police did not broach the subject, rather Rousan interjected them on his own as part of the story he told police. Additionally, his prior convictions had been mentioned during voir dire when it was unclear whether Rousan would later testify, and the jury was instructed at that time that the convictions could not be used as evidence of guilt.

Though a confession is generally inadmissible when it implicates that the defendant committed other offenses, there is an exception: where "the part or parts relating to the other offenses . . . are inseparable" from the part that relates to the crime for which the defendant is being tried, "courts almost universally hold the evidence admissible in its entirety, if given subject to a cautionary instruction." *State v. Brown*, 584 S.W.2d 413, 415 (Mo.App. 1979). In Rousan's confession, he told what the trial court deemed a "unique tale" to show that the Lewises were killed out of mercy. He mentioned his other crimes on his own accord when describing how he came to know Mr. Lewis, and this was a set up to explaining why Mr. Lewis asked him to kill his wife and him. If this portion would have been redacted, the tale would not have been complete. Additionally, the statements that he made did not contain details. Instead Rousan merely mentioned that when he hid in the Lewises' barn, he had escaped from prison where he was being held for raping and assaulting his girlfriend. He was not prejudiced because his convictions had already been brought up to the jury in voir dire, and the court had told the jurors that his past convictions could not be used to find him guilty. Thus, the motion court cannot be said to have clearly erred as there is no reasonable probability that the references to his statements prejudiced him.

IX.

Rousan also claims Wolfrum and Scholz were ineffective for failing to present Samuel LaFrank's testimony during the guilt phase of his case. LaFrank was Robert Rousan's cellmate. He had been convicted of statutory sodomy of a child, unlawful delivery of a controlled substance, and some offenses related to motor vehicles.

LaFrank would have testified that Robert told him there was no ringleader because they were just going to the Lewises' farm to steal cattle, and that Mr. Lewis had come across the field on a tractor, at which point Brent went back to the truck to retrieve the gun, and shot Mr. Lewis. LaFrank also would have testified that Rousan tried to take the gun from Brent, but Brent pushed him away and thereafter shot Mrs. Lewis.

LaFrank was interviewed by Tony Kuntz, a defense investigator, and based on his findings the defense decided not to call him. Though defense counsel could not distinctly come up with a trial strategy for their failure to call him as a witness, Scholz stated that the sodomy conviction was a factor.

Rousan failed to show that he was prejudiced by counsels' failure to call LaFrank. Counsel did call Timothy Barron, who was also incarcerated with Robert Rousan. Barron had convictions for four burglaries, sale of marijuana, stealing by deceit, and possession of a burglary tool. He testified at trial that Robert told him Rousan did not kill anyone and that it was Brent who, out of control, killed the Lewises. Barron also testified that Robert told him he had made a deal with the state for his testimony, and that if he did not go through with it he would get the death penalty or go to prison for life. Robert then told him it made no sense for everyone to go down for the crime. Barron testified that he was in contact with Rousan while in the Washington County jail, and that Rousan told him he was not guilty. Though Rousan contends that Barron's statements were not cumulative of LaFrank's testimony—because LaFrank's testimony would have showed why they went to the farm, and that the plan had not been to kill the Lewises—there is no reasonable probabili-

ty that the outcome of the trial would have been different if LaFrank had testified

## X.

Rousan next argues that counsel was ineffective for their failure to object to two aggravating circumstances that he contends were duplicative. The jury was given Instruction 25, based on MAI–CR3d 313.40, and containing these aggravators, which Rousan disputes:

In determining the punishment to be assessed under Count I against the defendant for the murder of Grace Lewis, you must first unanimously determine whether one or more of the following statutory aggravating circumstances exists:

\* \* \*

3. Whether the defendant murdered Grace Lewis for another for the purpose of defendant receiving money or any other thing of monetary value from Grace Lewis or another.

\* \* \*

6. Whether the murder of Grace Lewis was committed while the defendant

was engaged in the perpetration of robbery.

Rousan cites many United States Supreme Court cases to bolster his proposition that these are cumulative, but he ignores the Missouri law that has consistently rejected this claim. *State v. Johnson,* 22 S.W.3d 183, 191 (Mo. banc 2000), *cert. denied,* 531 U.S. 935, 121 S.Ct. 322, 148 L.Ed.2d 259 (2000); *State v. Griffin,* 756 S.W.2d 475, 489 (Mo. banc 1988), *cert. denied,* 490 U.S. 1113, 109 S.Ct. 3175, 104 L.Ed.2d 1036 (1989); *State v. Walls,* 744 S.W.2d 791, 798–99 (Mo. banc 1988), *cert. denied,* 488 U.S. 871, 109 S.Ct. 181, 102 L.Ed.2d 150 (1988); *State v. Jones,* 749 S.W.2d 356, 365 (Mo. banc 1988), *cert. denied,* 488 U.S. 871, 109 S.Ct. 186, 102 L.Ed.2d 155 (1988). An objection to the instruction would have been meritless, thus counsel cannot be deemed ineffective. *Clay,* 975 S.W.2d at 136.

## XI.

Along with five other statutory aggravators,[3] the jury was presented with the following statutory aggravator:

**3.** The jury was given Instruction 25, based on MAI CR3d 313.40, which stated:

In determining the punishment to be assessed under Count I against the defendant for the murder of Grace Lewis, you must first unanimously determine whether one or more of the following statutory aggravating circumstances exists:

1A. Whether the defendant was convicted of rape in the second degree on August 12, 1998, in the Superior Court of Washington for King County, State of Washington.

1B. Whether the defendant was convicted of assault in the second degree on August 12, 1998, in the Superior Court of Washington for King County, State of Washington.

2. Whether the murder of Grace Lewis was committed while the defendant was engaged in the commission of another unlawful homicide of Charles Lewis.

3. Whether the defendant murdered Grace Lewis for another for the purpose of the

defendant receiving money or any other thing of monetary value from Grace Lewis or another.

4. Whether the defendant directed William Brent Rousan to murder Grace Lewis.

5. Whether the murder of Grace Lewis involved depravity of mind and whether, as a result thereof, the murder was outrageously and wantonly vile, horrible, and inhuman. You can make a determination of depravity of mind only if you find:

That the defendant killed Grace Lewis after she was bound or otherwise rendered helpless by defendant or William Brent Rousan and that defendant thereby exhibited a callous disregard for the sanctity of all human life.

6. Whether the murder of Grace Lewis was committed while the defendant was engaged in the perpetration of robbery.

You are further instructed that the burden rests upon the State to prove at least one of

5. Whether the murder of Grace Lewis involved depravity of mind and whether, as a result thereof, the murder was outrageously and wantonly vile, horrible, and inhuman. You can make a determination of depravity of mind only if you find:

That the defendant killed Grace Lewis after she was bound or otherwise rendered helpless by defendant or William Brent Rousan and that defendant thereby exhibited a callous disregard for the sanctity of all human life.

Rousan's counsel failed to object to the aggravator, which Rousan contends wrongfully asked the jury to consider whether he "killed" Mrs. Lewis rather than "directed Brent Rousan to kill Grace Lewis." Rousan took issue with statutory aggravators four and five on direct appeal to this Court. This Court, performing plain error review, stated that murder can be attributed to an accomplice, but not the act of killing, because it is not a legal conclusion. *Rousan I,* 961 S.W.2d at 852. Thus, the Court stated "it follows that a defendant who directed another to murder a victim, could not also have 'killed' the victim." *Id.* However, the Court stated that using the word "killed" rather than "murder" was insufficient to amount to a miscarriage of justice, because it was consistent with the state's theory and the jury's finding at the closing of the guilt phase, which was that he was guilty of first degree murder as an accomplice. *Id.* at 853. This Court pointed out that it is well established that only one valid aggravating circumstance is needed to uphold a sentence to death. *Id.* Thus, even if the two statutory aggrava-

tors that he complained of, four and five, were thrown out, the remaining aggravators were sufficient to sentence Rousan to death. *Id.*

 Rousan admits, as this Court stated in ruling on his direct appeal, that Missouri requires only one valid aggravating circumstance to uphold a death sentence. *State v. McMillin,* 783 S.W.2d 82, 104 (Mo. banc 1990), *cert. denied,* 498 U.S. 881, 111 S.Ct. 225, 112 L.Ed.2d 179 (1990). But he contends that the one valid aggravator cannot be presumed to excuse a "constitutional error in the admission or exclusion of evidence." *Tuggle v. Netherland,* 516 U.S. 10, 116 S.Ct. 283, 133 L.Ed.2d 251 (1995). However, as this Court pointed out on direct appeal, *Tuggle* is not applicable here, as it held that a valid aggravating circumstance was not always sufficient to uphold the death sentence when there is a constitutional error with respect to the "admission or exclusion of evidence." There is no constitutional error in this case, and the aggravating circumstance was sufficient to uphold the death sentence.

## XII.

Rousan next claims ineffectiveness of counsel due to counsels' failure to bring out Robert Rousan's inconsistent statement regarding whether Rousan told him to wait while he (Rousan) secured the premises. Robert testified at Rousan's trial that Rousan told him (Robert) to wait while he (Rousan) secured the premises. But in Robert's initial statement to Sergeant Conway and Sergeant Crump, Rob-

the foregoing circumstances beyond a reasonable doubt. On each circumstance that you find beyond a reasonable doubt, all twelve of you must agree as to the existence of that circumstance.

Therefore, if you do not unanimously find from the evidence beyond a reasonable

doubt that at least one of the foregoing statutory aggravating circumstances exists, you must return a verdict fixing the punishment of the defendant at imprisonment for life by the Department of Corrections without eligibility for probation or parole.

ert did not mention such a statement. Rousan claims that if this inconsistency would have been brought out at trial, it would have furthered the defense theory that he did not plan on killing anyone when he went to the Lewises' farm. He claims that such a statement rebutted the state's theory that he was the "ringleader," and supported the conclusion that he was merely guilty of second-degree murder. Rousan specifically states that neither Sergeant Conway nor Sergeant Crump were questioned about the inconsistency in Robert's statements.

 Scholz noted that Robert's story had many inconsistencies, and that he brought out the discrepencies he thought were important, which included most of them. In fact, the record shows extensive cross-examination of Robert, and contrary to Rousan's contention, it shows Robert was cross-examined about his "securing the premises" statement. The extent of cross-examination is usually a matter of trial strategy. *Kelley v. State,* 24 S.W.3d 228, 233 (Mo.App.2000).

### XIII.

 Rousan next claims that counsel were ineffective for failing to present his BFI work records, which showed he worked from May to August 1993. He claims this evidence would have shown that since he was working he had limited time in which to plan the murders of Mr. and Mrs. Lewis, engage in illegal drug activity, and case the Lewis farm. Rousan feels he was prejudiced because this evidence would have supported that he was guilty only of second-degree murder, and the theory presented by defense, which was that he was not to be believed.

Rousan failed to show that counsels' failure to present the BFI records was other than proper trial strategy. The records only showed his gross earnings, withhold-ings, net pay, and that he received paychecks weekly between May 8, 1993 and August 7, 1993. Nothing in the records showed the times he worked, nor indicated his wages such that his hours could be calculated. As defense counsel Wolfrum testified, the records were not presented because they did not preclude him from casing the farm.

### XIV.

Rousan next contends that counsel should have objected to Robert Rousan's testimony. Rousan argues that this testimony was improperly obtained from the state, because in exchange for his testimony, the state offered Robert a second-degree murder conviction and a fifteen year sentence. Rousan cites Rule 4–3.4 in support of his contention, but that rule merely disallows a lawyer to offer a witness an inducement that is prohibited by law. It does not refer to a state offering an inducement. As for his assertion that the inducement given to Robert was unlawful, he cites *United States v. Singleton,* 144 F.3d 1343 (10th Cir.1998). However, Rousan's reliance on this case is misplaced. While the Tenth Circuit originally ruled that a promise of leniency violated a federal statute, it later overruled itself. *United States v. Singleton,* 165 F.3d 1297 (10th Cir.1999) (en banc), *cert. denied,* 527 U.S. 1024, 119 S.Ct. 2371, 144 L.Ed.2d 775 (1999).

### XV.

 Rousan lastly argues that counsel was ineffective for failing to object to the death penalty sentence. He states that the Eighth Amendment prohibits an accomplice convicted of first-degree murder to be sentenced to death unless the accomplice killed, attempted to kill, intended for the victim to be killed or that lethal force be used. He contends that he did none of

these. The motion court found that "[w]hile a person cannot be sentenced to death solely based on the acts of another, where the defendant's own acts showed an intention that a murder be committed and the evidence shows deliberation by the defendant, such defendant may be sentenced to death based on his own conduct." *See* *State v. Isa*, 850 S.W.2d 876 (Mo. banc 1993). Rousan asserts that the motion court misconstrued *Isa*, which also states that "it is never permissible to sentence a person to death for the acts of another." *Id.* at 902–03. But the motion court's conclusion is not contrary to this proposition, as the court specifically stated that "the defendant's own acts" must show the intention for murder to be committed and that the evidence show that the "defendant" deliberated.

Rousan also argues that the sources of the evidence to prove intent lacked credibility such that it was not clear that Rousan intended to kill Mrs. Lewis. He bases this claim on the fact that it took the jury several hours to reach a decision in both phases of the trial. Rousan fails to note that counsel did move for acquittal at the end of the state's case and argued in the motion for new trial that there was insufficient evidence to sustain Rousan's conviction. Rousan's confession to the police shows that he clearly deliberated about Mrs. Lewis' murder. He told the police that Mr. Lewis had asked him to kill Mrs. Lewis because she was sick, and that he finally agreed to kill both Mrs. Lewis and Mr. Lewis. Additionally, Rousan described the trip to the Lewises' house in his recorded statement to the police, saying: "We left the house. Robert and Brent, they thought we were going to steal some cattle. We weren't going to steal no cows. I didn't tell them, I didn't want them to know. I didn't even know if I could do what I was setting out to do anyway." Sergeant Conway also testified that Rousan told him that on the way to the Lewises' farm that he told Brent that "they would all fry" if they got caught.

Robert's testimony also points to the fact that Rousan deliberated. He testified that when the three men approached the Lewis farm, Rousan pulled out and loaded a semi-automatic rifle, which he said was for use if anybody was there. When Brent exclaimed that they needed to do what they were going to do, and not waste anymore time, Rousan told him to wait until he (Rousan) and Robert secured the house. Brent then shot Mrs. Lewis, although he only broke her arms. As Mrs. Lewis headed into the house, Rousan grabbed her, and directed Brent to "finish it."

Though Robert's and Rousan's statements may have contained inconsistencies, the "credibility and the effects of conflicts or inconsistencies in testimony are questions for the jury." *State v. Jackson*, 608 S.W.2d 420, 421 (Mo. banc 1980). On review this Court must accept as true all evidence favorable to the verdict, including all favorable inferences, and disregard all contrary evidence and inferences, as "the Court's function is not to substitute its judgment for that of the jury but to determine whether the evidence, considered in the light most favorable to the state is sufficient to support the verdict." *State v. Strickland*, 609 S.W.2d 392, 395 (Mo. banc 1980). Additionally, a reviewing court does not weigh the evidence. *State v. Kelly*, 539 S.W.2d 106, 109 (Mo. banc 1976). Rather, review of a challenge to the sufficiency of the evidence "is limited to determining whether there was sufficient evidence from which reasonable persons could have found defendant guilty as charged." *Id.*

### Conclusion

We have reviewed the findings and conclusions of the motion court. We uphold

the motion court's legal conclusion. Moreover, there is no clear error in the court's factual findings. The judgment is affirmed.

PRICE, C.J., LIMBAUGH, WHITE, HOLSTEIN and BENTON, JJ., and CRAHAN, Sp.J., concur.

LAURA DENVIR STITH, J., not participating.