# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 08-2147

_____

Robert H. Hunt, Jr.,                            *
                                                *
            Appellee,                           *
                                                *   Appeal from the United States
      v.                                        *   District Court for the
                                                *   District of Nebraska.
Robert Houston, Director, State of              *
Nebraska Department of Correctional             *
Services,                                       *
                                                *
            Appellant.                          *

_____

Submitted: December 11, 2008
       Filed: April 23, 2009

_____

Before WOLLMAN, BYE, and RILEY, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

      In 1984, Robert H. Hunt Jr. was convicted and sentenced to death for the murder of Beverly Ramspott. On direct appeal, the Nebraska Supreme Court vacated Hunt's death sentence, and he was later sentenced to life in prison. State v. Hunt, 371 N.W.2d 708 (Neb. 1985) (Hunt I). Following his unsuccessful attempts to obtain state postconviction relief (discussed in more detail below), Hunt petitioned for a writ of habeas corpus in the United States District Court for the District of Nebraska. A new trial was ordered, and the State of Nebraska appealed. We reverse.

On the evening of April 12, 1984, Hunt's wife called the Norfolk, Nebraska, police department to report that her husband was behaving erratically and claiming to have killed someone. Several police officers were dispatched to Hunt's residence, where they found Hunt sitting alone on the living room floor, sobbing. Although he was visibly disturbed, Hunt eventually explained that he had killed a woman and gave the officers the victim's address.

Two officers left the scene to investigate Hunt's claim. Hunt provided additional information to the remaining officers, telling them that he had brandished a BB gun to gain entrance to the woman's trailer and that he had sexually assaulted her after she was dead. Hunt directed the officers to a box containing several pairs of ladies' underwear, nylon hosiery, pornographic magazines, a pair of glasses, and a BB gun. As Hunt sobbed, he muttered the words "please don't kill me." After one of the officers assured Hunt that no one was going to kill him, Hunt responded "[n]o, not me. She said please don't kill me, please don't kill me, and I didn't listen, I did it anyway."

Meanwhile, upon arriving at the address Hunt had provided, the two officers found Ms. Ramspott lying nude, face down in an empty bathtub. They observed that nylon material was wrapped around Ms. Ramspott's neck and that something had been stuffed into her mouth. The officers notified their colleagues at the Hunt residence that Ms. Ramspott was dead, whereupon Hunt was arrested and taken to the Norfolk police station.

Officer Leon Chapman met Hunt at the station and began the first of two interviews. The first interview started shortly after midnight on April 13. After being informed of his rights, Hunt agreed to talk to Officer Chapman about the incident. Hunt explained that he had been plagued by violent fantasies in which he would render a woman unconscious and then have sex with her. He stated that many years

earlier he had assaulted a high school teacher for the purpose of fulfilling his fantasy. He also stated that on number of previous occasions he had taken a kitchen knife and some pornographic materials and had gone looking for a woman to attack, but had been unable to find a suitable victim.

Hunt explained that he picked Ms. Ramspott after seeing her photo in an engagement announcement in the local paper. He stated that he shoplifted a BB gun, a rope, and a package of nylons. He then drove to Ms. Ramspott's home and surveilled her house for some time before knocking on the door and forcing his way in. Hunt provided details about how he strangled Ms. Ramspott into unconsciousness and gratified his sexual urges. Officer Chapman asked Hunt if he had intended to kill Ms. Ramspott, to which Hunt replied that his intent was "only to render her unconscious and then have sex with her." Officer Chapman then asked Hunt for permission to search his home and vehicle, which Hunt granted. At the conclusion of the interview, Chapman asked Hunt if he would be willing to provide a recorded statement of what he had discussed. Hunt refused, stating that he wanted to confer with an attorney before giving a taped or written statement.

After the first interview, Officer Chapman spoke with the Madison County Attorney, Richard Krepela, and several other individuals involved in the investigation. They determined that Hunt should be interviewed again to clarify some details in his first statement, particularly on the issue of intent. The second interview began at approximately 9:30 a.m. on April 13. Hunt was not provided with an attorney, so Officer Chapman again read Hunt his rights and obtained a waiver. During the second interview, Hunt supplied some additional details and added one critical element to his confession. In response to an inquiry about premeditation, Hunt admitted that his intent was to kill Ms. Ramspott before the sexual assault. Hunt then asked why he had not been given an attorney after his earlier request. Officer Chapman responded that he believed Hunt's request had been limited to circumstances involving a written or

recorded statement, and after some discussion, Hunt seemed to agree with this characterization. Immediately thereafter, Officer Chapman concluded the interview.

Officer Chapman drafted an eighteen-page report summarizing the investigation and describing the interviews. The original report was placed in police department files and a copy was given to Krepela, who then engaged in an act of prosecutorial misconduct. Krepela knew that convicting Hunt of first-degree murder required proof that the killing was premeditated. He also apparently recognized that the most damning evidence of intent was Hunt's admission of premeditation in the second interview and that Hunt's request for an attorney made that second statement vulnerable to suppression. Krepela therefore retyped the report, omitting Hunt's requests for an attorney, as well as Officer Chapman's statement that the purpose of the second interview was to elicit evidence of premeditation.

Krepela's attempt to alter the evidence quickly unraveled. Hunt's defense counsel, Tom DeLay, learned that something was amiss when he shared the report with Hunt, who recalled that there had been some discussion about his right to an attorney. DeLay filed a motion to suppress Hunt's statements, and an evidentiary hearing was scheduled for June 8, 1984. Krepela sought to cover his tracks by having Officer Chapman amend the original report on file at the police department, but Chapman refused to do so. Recognizing that he had erred and that he might be jeopardizing the case against Hunt, Krepela determined that he could not continue to act as the prosecuting attorney. Krepela contacted a friend and former deputy, James Smith, and asked him to take over as a special prosecutor.

On the day before the suppression hearing was to take place, DeLay, Krepela, and Smith met with Judge Richard Garden, to whom Hunt's case had been assigned. No court reporter was present at the meeting, and faded memories have left some of the details obscured. Nevertheless, everyone agrees that Krepela admitted some

impropriety in handling the police reports and ceded control of the case to Smith.[1] Judge Garden has since testified that no one told him that evidence had actually been altered. Instead, his impression was that Krepela had failed to disclose all of the police reports. Nothing was said about the professional ramifications of Krepela's misconduct, and the issue did not come to the attention of the state bar association until many years later. See In Re Krepela, 628 N.W.2d 262 (Neb. 2001).

Hunt's motion to suppress was continued until June 25, 1984. At the suppression hearing, the original, unaltered report was received into evidence, and Krepela's misconduct was not mentioned. DeLay argued that Hunt's second statement to Officer Chapman was inadmissable because Hunt had invoked his right to an attorney and none was provided. DeLay also sought the suppression of statements Hunt made prior to his arrest and exclusion of evidence found in Hunt's home and vehicle. Hunt testified on his own behalf to establish the nature of his request for a lawyer. Hunt agreed with Officer Chapman's testimony that the request occurred at the conclusion of the first interview, when Officer Chapman had proposed a written or recorded statement. Hunt contended, however, that the request was unqualified, rather than limited to a writing or recording. Judge Garden ultimately held that all of the evidence was admissible, with the exception of one post-arrest statement not at issue here.

The trial began on August 8, 1984. Due to the substantial amount of evidence showing that Hunt had killed Ramspott, DeLay believed that Hunt's best hope was a second-degree murder conviction, which carried a maximum sentence of life imprisonment. Because the difference between first and second-degree murder turned on the element of premeditation, DeLay was very much concerned about Hunt's second statement to Officer Chapman. Just prior to the beginning of the trial,

---

[1]Although Smith took over as prosecutor, Krepela was never formally removed from the case. He later appeared briefly for the state on the day Hunt was sentenced, but he did not comment.

however, Smith informed DeLay and Judge Garden that he would not use that second statement. Instead, Smith relied on Hunt's pre-arrest statements and his confession during the first interview.

DeLay vigorously defended Hunt throughout the trial, challenging the credibility of the government's witnesses and arguing that the state could not prove that Hunt had a premeditated intent to kill Ms. Ramspott. DeLay did not introduce evidence of Krepela's altered police report. He later testified that he did not raise the issue of Krepela's misconduct because he believed it would have bolstered Officer Chapman's credibility, since Chapman had refused to ratify the deception. DeLay also explained that his reticence to discuss Krepela involved a more fundamental concern: to broach the subject of the altered report would have invited the state to introduce its best evidence of premeditation and potentially would have waived any argument Hunt had against admission of the second confession.

During his closing argument, DeLay employed the strategy of deprecating his client before the jury. DeLay began his remarks by stating:

> This is a tough case. This is tough. We have got a beautiful young girl who is dead. We have a defendant, Robert Hunt, who killed her. He murdered Beverly Ramspott on April 12, 1984, and he did so in Madison County. Those are some of the elements of both first and second degree murder. He is a creepy, slimy, sexual degenerate. I don't think there is anyone in the courtroom who could call him anything else. He took the life of a beautiful young girl who died during the administration of events for his own sexual gratification. He's a creep. If you put ooze on the door, he would ooze into the door.
>
> Today we have to decide whether or not he is guilty of first or second degree murder. We can use our gut, and we can use our heart, and we can go back to Salem and we can go after the witch, because there they use their gut and their heart and their prejudice. But, that's not why you are here. You are here to use your brain. You are here to disregard

> prejudice and sin and the horrible fact of the act, and consider whether or not the State has proved beyond a reasonable doubt that Mr. Hunt is guilty. . . . That is your duty. You are to make a decision and make it on the evidence, not on what your gut tells you or what your heart tells you.

According to DeLay, his remarks were intended to build credibility with the jury. He also testified that he wanted to force jurors to confront their visceral reaction to the crime and put those feelings aside so they could make a cerebral distinction between first and second-degree murder. DeLay admitted that he had not discussed this strategy with Hunt beforehand, explaining that he wanted to surprise Hunt and thereby generate an emotional response. He claimed that his strategy had worked, as the words had produced tears from Hunt.

After deliberating for several hours, the jury found Hunt guilty of first-degree murder, and a sentencing panel later sentenced Hunt to death.

DeLay represented Hunt on direct appeal to the Nebraska Supreme Court and argued, among other things, that Judge Garden had erred in admitting certain evidence and that Hunt's death sentence should be reversed. As indicated earlier, the Nebraska Supreme Court affirmed Hunt's conviction but vacated his death sentence.

Hunt first raised the issue of Krepela's prosecutorial misconduct eleven years later, filing a *pro se* motion for postconviction relief in the District Court of Madison County, Nebraska. Judge Garden again presided over Hunt's case, and Madison County Public Defender Harry Moore was appointed to represent Hunt. Moore made a variety of arguments based on Krepela's alteration of the police report. He asserted that the prosecutorial misconduct had resulted in a due process violation, that DeLay had been ineffective in failing to fully expose and exploit the deception, and that Smith and DeLay operated under a conflict of interest because of their desire to avoid tarnishing Krepela's reputation. Moore alleged that there was a tacit agreement

between the prosecution and defense counsel to protect Krepela. Moore also suggested that Judge Garden should recuse himself from Hunt's postconviction proceeding because he was a potential witness. Judge Garden expressed skepticism regarding his value as a witness, stating that he had no recollection of Krepela altering a report and that "if you want to put me under oath and have me say I don't know anything about it, fine. . . . I don't say fine, because I have no knowledge." Judge Garden remained on the case and concluded that Hunt's arguments were without merit.

Hunt subsequently omitted any explicit reference to Krepela's misconduct in his first post-conviction appeal to the Nebraska Supreme Court. Moore later explained that this was a tactical decision, in which he believed Hunt had acquiesced, based on the inability to develop a record that showed any prejudice from Krepela's misconduct. Moore focused instead on DeLay's closing statements at trial, arguing that DeLay's deprecating remarks and admission of the elements of second-degree murder amounted to a total absence of counsel, in violation of the Sixth Amendment. The Nebraska Supreme Court attributed DeLay's closing remarks to a legitimate trial strategy and held that the deprecatory comments did not prejudice Hunt. It therefore concluded that there was no Sixth Amendment violation and denied Hunt's postconviction appeal. See State v. Hunt, 580 N.W.2d 110 (Neb. 1998) (Hunt II).

Following the Nebraska Supreme Court's denial of postconviction relief, Hunt filed a petition for habeas corpus in federal court. Because some of Hunt's claims were deemed unexhausted, however, the district court dismissed the petition without prejudice. See Hunt v. Hopkins, 266 F.3d 934 (8th Cir. 2001) (Hunt III). In a second state postconviction action, Hunt sought to raise several claims based on the alteration of Officer Chapman's report, framing the issue as a denial of effective trial and postconviction counsel. The Nebraska Supreme Court concluded that Hunt had no statutory or constitutional right to effective postconviction counsel. Regarding Hunt's contention that DeLay had been ineffective in handling Krepela's misconduct, the

-8-

court explained that the Krepela-related claims should have been raised in Hunt's first postconviction appeal; it therefore concluded that the claims were procedurally barred. See State v. Hunt, 634 N.W.2d 475, 480 (Neb. 2001) (Hunt IV).

Hunt then refiled his federal habeas petition, asserting nine constitutional claims. Three of those claims involved arguments, stemming from Krepela's misconduct, that the Nebraska Supreme Court had found procedurally barred. The state concedes that two other claims, involving the state trial court's admission of evidence and DeLay's inflammatory closing remarks, were subject to review on the merits. The remainder of the claims concerned issues Hunt has abandoned in the present appeal.

Notwithstanding the Nebraska Supreme Court's determination that state law procedurally barred Hunt's Krepela-related claims, the district court concluded that those claims had been adequately presented in state court and were not defaulted. The district court alternatively held that Hunt had established cause and prejudice to overcome any procedural bar. It then found that Hunt's Krepela-related claims were inextricably connected to his claims based on ineffective assistance of counsel and denial of his motion to suppress. The court concluded that, taken together, the deficiencies in Hunt's trial amounted to structural error. It thus granted Hunt's petition and ordered that his conviction be vacated unless the state provided him a new trial.

II.

We review the district court's conclusions of law *de novo* and its factual findings for clear error. Palmer v. Clarke, 408 F.3d 423, 428 (8th Cir. 2005). Under the Antiterrorism and Effective Death Penalty Act (AEDPA), a writ of habeas corpus may be granted only if the relevant state court decision was either "contrary to, or involved an unreasonable application of, clearly established Federal law, as

determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Id. § 2254(d)(2). "An incorrect decision is not necessarily unreasonable, and we may not grant a writ of habeas corpus unless the state court decision is both wrong and unreasonable." Palmer, 408 F.3d at 429.

## III.

We turn first to Hunt's claims regarding Krepela's alteration of the police report and the subsequent response to the misconduct. Hunt contends that the falsification of the report and the lack of an adequate investigation violated his due process rights; he also argues that DeLay was ineffective as trial counsel because he participated in an off-the-record meeting about the altered report, failed to notify the state bar association of the prosecutorial misconduct, and failed to raise the issue at trial to discredit the prosecution. The state argues that these claims are procedurally barred and, alternatively, that they fail on the merits.

Addressing the procedural issue as one of exhaustion, Hunt argues that the substance of the Krepela-related claims was fairly presented to the Nebraska Supreme Court. The district court accepted Hunt's characterization and relied on Clemmons v. Delo, 124 F.3d 944 (8th Cir. 1997), to hold that Hunt had adequately presented the Krepela-related claims in state court and avoided any default. The district court erred, however, in treating the issue as simply a matter of exhaustion, because the Nebraska Supreme Court specifically addressed the Krepela-related claims in Hunt's second postconviction appeal, holding that Hunt's allegation of ineffective assistance of trial counsel was barred by a state procedural rule. See Hunt IV, 634 N.W.2d at 480 ("Because all of the issues raised in Hunt's petition for postconviction relief were related to ineffective assistance of postconviction counsel or either were raised or could have been raised in earlier proceedings, we determine that the district court did not err in dismissing Hunt's petition."); see also Nicklasson v. Roper, 491 F.3d 830,

-10-

839 (8th Cir. 2007) (explaining that when a state court has clearly expressed that its judgment rests on a state procedural bar, whether it also addressed the merits in the alternative is "of no relevance").

Relying on its interpretation of state law, the Nebraska Supreme Court concluded that Hunt should have presented any Krepela-related claims in his first postconviction action, and it held that he defaulted those claims by not doing so. See id. at 478, 480. To reconsider whether a default actually occurred would be to second-guess the Nebraska Supreme Court on a question of state procedural law. "[F]ederal courts do not look at whether state courts have correctly applied their own procedural rules." Clemons v. Luebbers, 381 F.3d 744, 751 (8th Cir. 2004). The proper inquiry, therefore, is not whether a default occurred, but whether Hunt has met the standard for disregarding a state procedural default.

Federal courts generally will not review claims that a state court has refused to consider because of the petitioner's failure to satisfy a state procedural requirement. Barnett v. Roper, 541 F.3d 804, 808 (8th Cir. 2008). This rule applies only if the state decision is based on independent grounds and is adequate to support the judgement. Id. To be adequate, a state procedural rule must be "firmly established and regularly followed." Id. (quoting James v. Kentucky, 466 U.S. 341, 348-49 (1984)). Morever, in some exceptional cases, "exorbitant application of a generally sound rule renders the state ground inadequate to stop consideration of a federal question." Lee v. Kemna, 534 U.S. 362, 376 (2002). In all other cases, "a state prisoner who fails to satisfy state procedural requirements forfeits his right to present his federal claim through a federal habeas corpus petition, unless he can meet strict cause and prejudice or actual innocence standards." Clemons, 381 F.3d at 750.

-11-

## A.

Hunt concedes that Nebraska's procedural rule provides an independent ground for denying his claims and that it is firmly established and regularly followed. He argues, however, that the rule is inadequate and exorbitant in this case because it assumes an unbiased forum for trial of a state postconviction action, which he contends he did not receive. Specifically, Hunt argues that Judge Garden's failure to recuse himself denied him a fair hearing. The initial problem with this argument is that Hunt's default occurred on appeal, not in the state trial court. Notwithstanding his accusation that Judge Garden was biased, Hunt was able to raise the nucleus of his claims and argue the existence of constitutional violations stemming from the altered police report. After Judge Garden rejected those arguments, Hunt did not reassert the claims in his first postconviction appeal to the Nebraska Supreme Court. That failure can hardly be attributed to the lack of an unbiased forum.

Furthermore, the record does not reveal the bias of which Hunt complains. Judge Garden expressed some skepticism about the relevance of certain testimony regarding the altered report, given the fact that the altered document was never used against Hunt. But the record does not support the allegation that Judge Garden was biased or "openly hostile" to Hunt's postconviction counsel. Accordingly, Hunt has not demonstrated that the application of Nebraska's procedural rule would be exorbitant in his case, and thus he can overcome his default only by showing cause and prejudice.

## B.

Hunt argues that he lacked the factual basis to assert his Krepela-related claims in his first postconviction appeal and can therefore show cause to overcome his default. He contends that he could not adequately develop the postconviction record because Judge Garden did not allow him to elicit testimony regarding Krepela's

misconduct and refused to make himself available as a witness. That assertion is inconsistent with the record from Hunt's first postconviction action, which contains substantial testimony on the altered police report from all of the key witnesses—including Officer Chapman, Krepela, Smith, DeLay, Hunt, and other police officers who were involved in the investigation. Although Judge Garden did not testify at that time, he was later deposed, and his testimony was consistent with his 1997 assertion that he did not know a report had been altered. It is therefore difficult to see how Judge Garden's testimony would have benefitted Hunt. In any event, Hunt cannot show that the absence of that testimony precluded him from presenting his claims.

The argument that Hunt lacked the factual predicate to present his claims is further belied by his inability to point to any evidence that has come to light in the last twelve years that would have substantially aided his presentation of the claims to the Nebraska Supreme Court. Hunt has been aware of Krepela's misconduct since before his 1984 trial. The facts supporting other claims, such as DeLay's failure to call Krepela as a witness at trial, stem from conduct of which Hunt either had first-hand knowledge or was very soon apprised. The remaining claims—including judicial bias and collusion among various participants in Hunt's trial—involve inferences about possible motives or actions for which there has never been any evidence. Despite more than a decade of additional litigation and several evidentiary hearings, Hunt has not pointed to any newly discovered evidence that would have supported those claims. Accordingly, Hunt has not established cause for excusing his state procedural default.

C.

Hunt is also unable to demonstrate prejudice. To demonstrate prejudice, he must show a reasonable probability that, but for the alleged constitutional violations,

the result of the proceeding would have been different.[2] See Easter v. Endell, 37 F.3d 1343, 1347 (8th Cir. 1994). Hunt first argues that had Krepela's misconduct been fully disclosed to the trial court, Judge Garden would have ruled differently on Hunt's motion to suppress the statements he made to Officer Chapman.[3] Assuming that were true, it still would not have had any impact on Hunt's trial. Hunt's first statement was not vulnerable to suppression because, as Hunt himself testified at the suppression hearing and has maintained ever since, he did not request an attorney until the conclusion of the first interview. The second statement was never admitted, and DeLay knew before the trial began that the state did not plan on using that evidence against his client. It is therefore immaterial whether Judge Garden might have excluded Hunt's second statement.

Hunt next argues that DeLay's failure to adequately investigate the misconduct and report the incident to ethics authorities resulted in prejudice. There is no

_____

[2]Although Hunt argues that the alleged constitutional violations in his case resulted in structural error, a finding of structural error does not obviate a petitioner's obligation to show prejudice when attempting to overcome a state procedural default. See Hatcher v. Hopkins, 256 F.3d 761, 764 (8th Cir. 2001); see also Ward v. Hinsley, 377 F.3d 719, 725-26 (7th Cir. 2004). But see Owens v. United States, 483 F.3d 48, 65-66 (1st Cir. 2007) (adopting a contrary view where petitioner was seeking review of a federal conviction).

[3]Both Hunt and the district court support this assertion with a record citation that appears to us to have been taken somewhat out of context. In a deposition taken for Hunt's federal habeas petition, Judge Garden was asked, "in 1984, if you were informed of an alteration of evidence, what would you have done?" Judge Garden's response—"I don't know. I've asked myself that question a dozen times"—was not specifically addressed to Hunt's motion to suppress and it does not establish that he would have ruled any differently. The follow-up question and Judge Garden's subsequent answer suggest he was referring to a possible obligation to report the misconduct to the state bar association. Indeed, our review of the record convinces us that it is unlikely Judge Garden's suppression ruling would have been any different, since the statements ruled upon were from Officer Chapman's original, unaltered report, and there is no evidence that they were tainted by Krepela's misconduct.

-14-

indication, however, that a more thorough investigation would have revealed any other improprieties. To the contrary, the myriad hearings, depositions, and investigations that have occurred over the last twenty-five years have tended to reinforce the state's position that the misconduct was limited to what was immediately known. Unsupported speculation about the possible existence of some yet undiscovered malfeasance does not establish prejudice. And while it may have been appropriate for DeLay to notify the state bar association about Krepela's misconduct, Hunt has not explained how such a disclosure would have affected the outcome of his case.

Hunt also insists that DeLay should have called Krepela as a witness and disclosed the misconduct to the jury. It is difficult to see how this could have assisted Hunt. As indicated earlier, DeLay has maintained that he decided not to call Krepela for two reasons: first, he believed Krepela's testimony would bolster Officer Chapman's credibility; and second, it would have invited the state to introduce Hunt's confession of premeditation.[4] This latter rationale is especially compelling, as Hunt himself has acknowledged that the second statement "formed the heart of the prosecution's first degree murder case." By calling Krepela as a witness and introducing evidence of the altered report, DeLay might have waived any objection to admission of the second statement. At best, it seems that calling Krepela might have distracted the jury, prompting the state to put on a series of witnesses to testify that all of its evidence was scrupulously gathered and fairly presented. At worst, it might have shown that while the nature of Hunt's request for an attorney was unclear, his premeditated intent to kill was not.

---

[4]In arguing that DeLay had other motives for not calling Krepela as a witness, Hunt again relies on what we perceive to be a slight mischaracterization of the record. Hunt cites a statement by DeLay that he "did not think it was proper" to call Krepela as a witness because "I like our profession, and I think it's an honorable profession." That observation, however, was made after DeLay had thoroughly explicated the tactical pitfalls of placing Krepela on the witness stand, and it was made in response to the suggestion that DeLay should have called Krepela solely for the purpose of embarrassing or humiliating him in front of the jury.

The possibility of any prejudice is further undercut by the existence of evidence beyond the statements to Officer Chapman that supported a finding of first-degree murder. Before the police had confirmed that a crime had been committed, Hunt confessed to the killing. The police immediately located several items of evidence that showed Hunt had planned the attack, and Hunt admitted that he had heard Ms. Ramspott plead for her life before he killed her. The police officers' testimony and the physical evidence gathered at the scene may well have been enough to convict Hunt of first-degree murder. Given all of this, Hunt has not shown that there is a reasonable probability that the outcome of his trial would have been different. Accordingly, the district court erred when it concluded that Hunt had not defaulted his Krepela-related claims.

IV.

Hunt raises two additional claims, both of which the state concedes are subject to review on the merits. Hunt argues that he was denied his Sixth Amendment right to effective trial counsel when DeLay made inflammatory remarks to the jury in his closing argument. He also contends, as he did on direct appeal, that the state trial court erred in admitting evidence obtained after he requested an attorney.

Citing United States v. Cronic, 466 U.S. 648 (1984), Hunt argues that DeLay's closing remarks amounted to a complete denial of counsel. As the Supreme Court has explained, a defense attorney's failure to subject the prosecution's case to "meaningful adversarial testing" gives rise to a presumption of prejudice. Id. at 659. In order for Cronic's presumption of prejudice to apply, however, the failure of defense counsel must be complete. See Freeman v. Graves, 317 F.3d 898, 900 (8th Cir. 2003). "The defendant must assert counsel failed to oppose the prosecution throughout the proceeding as a whole, rather than at specific points." Id.

The Nebraska Supreme Court rejected Hunt's argument that the Cronic standard of presumed prejudice should be applied to DeLay's comments, holding that DeLay

-16-

had functioned throughout the proceeding as a meaningful adversary. Hunt II, 580 N.W.2d at 114. It then examined DeLay's performance under the standard set forth in Strickland v. Washington, 466 U.S. 668 (1984), and determined that even if DeLay's comments could be considered deficient, they did not prejudice Hunt. This conclusion is well supported by the record, and the Nebraska Supreme Court's application of Strickland, rather than Cronic, was not contrary to clearly established federal law. See, e.g., Malcom v. Houston, 518 F.3d 624, 627 (8th Cir. 2008) (explaining the rare circumstances in which a presumption of prejudice is appropriate); see also Knowles v. Mirzayance, 129 S. Ct. 1411, 1420 (2009) (applying "doubly deferential judicial review . . . to a Strickland claim evaluated under the § 2254(d)(1) standard").

Hunt also contends that the state trial court improperly admitted evidence. Specifically, he argues that because Officer Chapman refused to accommodate his request for an attorney, Judge Garden should not have admitted the evidence produced by Hunt's subsequent statement and consent to search his vehicle. The Nebraska Supreme Court analyzed these arguments on direct appeal and concluded that any error in admission of the evidence was harmless. Hunt I, 371 N.W.2d at 716, 719. Although it determined that Hunt's second interview with Officer Chapman was "constitutionally suspect," the court held that Hunt was not prejudiced because that statement was not used at trial.[5] With respect to the items found in Hunt's vehicle—a pair of opera glasses and a partial box for the BB gun Hunt used to commit the crime—the court determined that they added nothing of significance to the prosecution's case and were merely cumulative. Id. at 719. Given the deferential

---

[5]Hunt argues that although the prosecution did not use the second statement, admission of that evidence was prejudicial because it forced DeLay to tailor his defense accordingly. Although DeLay may not have had a great deal of advance notice, the record shows that he knew before the trial commenced that the state would not introduce the second statement.

-17-

standard of review that we are required to apply under the AEDPA, we conclude that Hunt's arguments with regard to these issues do not entitle him to relief.

V.

The judgment is reversed, and the case is remanded with directions to dismiss the petition.

_____