# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 07-3031

_____

Donald G. Becker,

             Petitioner - Appellant,

v.

Al Luebbers,

             Respondent - Appellee.

Appeal from the United States
District Court for the Eastern
District of Missouri.

_____

Submitted: December 9, 2008
Filed: August 27, 2009

_____

Before MELLOY and BENTON, Circuit Judges, and DOTY,[1] District Judge.

_____

MELLOY, Circuit Judge.

In 1995, a Missouri jury convicted Donald G. Becker of sodomizing and attempting to rape his minor daughters in violation of Missouri Revised Statutes §§ 566.060 and 566.030, Cumulative Supplement 1991. He currently is serving a life sentence for the attempted rape conviction and has completed a concurrent, seven-year

_____

[1] The Honorable David S. Doty, United States District Judge for the District of Minnesota, sitting by designation.

sentence for the sodomy conviction.[2]  Becker exhausted his present claims in state court and filed a timely petition for federal habeas relief.

Becker argues that trial counsel was constitutionally ineffective for failing to: call certain witnesses or offer written statements, police reports, hospital records, or juvenile records to show that the victims were not credible; call other witnesses to contradict a victim's description of one of the offenses; cross-examine the victims more vigorously; and impeach the victims more completely with prior false statements, prior false allegations of sexual abuse, and purported motives for falsely accusing Becker.  The district court[3] rejected Becker's claims, applying the standards of the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), codified in part at 28 U.S.C. § 2254(d).  We affirm.

I.    Background

Becker and his wife had two daughters, TKB born in 1977 and TRB born in 1980.  Becker separated from his wife shortly after the younger daughter, TRB, was born, and he moved to California.  TKB and TRB stayed near St. Louis.  The daughters visited Becker three times in California after about 1987 and also saw him during some holiday visits in St. Louis when Becker returned for Christmas with his

---

[2]Becker's state proceedings were protracted and involved a mistrial, conviction at a second trial, and the imposition of two concurrent life sentences.  He then received a grant of state post-conviction relief resulting in a reduction of his life sentence for the sodomy conviction to the term of seven years.  The grant of state post-conviction relief and the remand occurred for reasons related to changes in Missouri law and unrelated to the issues now on appeal.

[3]The Honorable Donald J. Stohr, United States District Judge for the Eastern District of Missouri, adopting the report and recommendation of the Honorable Lewis M. Blanton, United States Magistrate Judge for the Eastern District of Missouri.

family at his mother's home. Eventually, Becker moved back to St. Louis, but his daughters saw him infrequently after his return. Neither girl made allegations against Becker contemporaneously with any sexual abuse. Rather, the crimes came to light several years after the fact.

In 1994, the older daughter, TKB, was placed under general anesthesia for oral surgery. While TKB was in a semi-conscious state during administration of the anesthesia, a nurse and an anesthesiologist heard her say that she had been sexually molested by her father. This statement prompted an investigation that led to more specific allegations from TKB and TRB and, eventually, to Becker's indictment. The State brought numerous sexual abuse charges against Becker, alleging various degrees of lascivious contact with both of his daughters between April 1987 and July 1991.

At trial, both daughters testified that Becker touched their vaginas with his hands on several occasions. In addition, TKB testified that Becker had attempted to have intercourse with her on at least one occasion. Regarding this attempted rape, TKB testified that in July 1991, at her grandmother's house in St. Louis, Becker had been "touching her all day" and ultimately attempted to have intercourse with her. According to TKB, she attempted to jump out of an upper-story window after this encounter.

Testimony from another family member who was present on the day of the attempted rape corroborated TKB's claim regarding her attempt to jump out of the window. In fact, TKB was admitted to a hospital in July 1991 for injuries sustained in an attempt to jump out of a window. At the time of this hospital admission, officials asked TKB about possible abuse, but she denied that she was a victim of abuse. She blamed her actions on problems and ongoing disagreements with her mother and trouble with her boyfriend.

Becker's trial counsel cross-examined TKB but did not question her as to specific details regarding her prior juvenile-court record or prior allegations of sexual abuse that she purportedly had made against police officers. In addition, trial counsel did not question TKB extensively about the attempted rape or events surrounding the attempted rape. Through the testimony of other witnesses, including a psychiatrist who treated TKB, the jury heard that TKB had psychological problems, suffered depression, experienced suicidal ideation, and had attempted suicide repeatedly. In addition, the jury learned that TKB had been hospitalized several times and involved in several run-ins with the law. The psychiatrist also testified as to his diagnoses and treatment of TKB regarding each hospital admission. The jury also learned that TKB had been in trouble with juvenile authorities in Illinois starting around 1991 for absenteeism from school, fighting, staying out late, running away from home, and drinking. Importantly, and consistent with the defense theory of the case, the jury heard that, as a consequence of TKB's allegations against Becker, she avoided having to serve a then-pending term of juvenile detention in Illinois related to a 1993 assault.

The jury also heard that, not only had TKB denied being a victim of sexual abuse at the time that she attempted to jump through the window, she had repeatedly denied being a victim of sexual abuse when asked by hospital personnel at the time of several other hospital admissions. During her hospital admissions, she repeatedly blamed her actions and psychological problems on her boyfriend, her mother, and her mother's boyfriend. Finally, the jury learned that TRB, TKB's younger sister, did not make any allegations of sexual abuse until after her sister had done so.

TKB and TRB testified that Becker also molested their female cousin, JB, who was a minor, and that a male relative who was also a minor had witnessed Becker's crimes. These two relatives testified at trial, denied having witnessed Becker abuse TKB or TRB, and denied being victims of Becker's abuse. JB claimed that TKB had attempted to coerce her into making allegations of sexual abuse against Becker. In fact, JB had surreptitiously recorded a telephone call from TKB that JB characterized

-4-

as an attempt by TKB to convince her to make false allegations against Becker. Prosecutors characterized the tape as a show of support by TKB encouraging JB to reveal abuse rather than an attempt by TKB to have JB fabricate allegations of abuse. The jury listened to the tape, and based on the verdict, it is clear that the jury believed TKB's testimony and the prosecutors' characterization of the tape and disbelieved JB. The jury heard from TKB and TRB, as well as other family members, that the girls' allegations against Becker had caused a split in Becker's extended family and that the two other family-member minors referenced above were aligned with the side of the family that supported Becker.

The jury also heard descriptions of two instances of suspicious conduct or statements that preceded TKB's revelation of abuse. First, a neighbor testified that she saw Becker kiss TKB and TRB inappropriately when they were very young by putting his tongue in their mouths. Second, the wife of one of TKB's cousins testified that, on one occasion after TKB had been very upset, TKB stated that she hated her father "because he always treats me like I'm his girl friend or something." TKB herself recited this statement in her own testimony when asked whether she had ever spoken of the abuse to an adult prior to her anesthesia-induced revelation in the operating room.

Based on this evidence, the jury convicted Becker of seven counts that included several counts of sexual abuse and sodomy, and one count of attempted rape. Five of these counts were dependant, in part, upon Becker's status as a prior felon based on a 1989 felony theft conviction. Becker moved for a new trial as to these five counts because the date of his prior felony was later than the dates alleged in these counts. The trial court granted the motion, and the state elected not to pursue the five counts further. As noted above, Becker received sentences of life imprisonment on each of the two remaining counts (one count of sodomy as to TRB and one count of attempted rape as to TKB), but the state courts reduced the sentence on the sodomy count to seven years' imprisonment based on issues not relevant to these federal proceedings.

Regarding the issues now on appeal, Becker filed a Missouri Rule of Criminal Procedure 29.15 motion in state court seeking post-conviction relief. He argued that trial counsel was ineffective for failing to offer juvenile records, medical records, and available written reports and testimony from several potential witnesses. Becker argued these materials and testimony would have shown details of TKB's prior interactions with law enforcement, prior interactions with other public officials and medical personnel, prior false allegations of sexual abuse, and attempts to encourage TRB to make claims against Becker. Becker argued that these details would have established TKB and TRB to be non-credible.

Becker also alleged that trial counsel was ineffective due to inadequate cross-examination of TKB and TRB and due to a failure to offer available evidence regarding a purported motive for TRB to falsely accuse Becker of sexual abuse. Becker asserted that TRB was mad at him for not buying her a Notre Dame jacket and that this anger served as her motive to make false accusations.

Becker also argued that trial counsel was ineffective for failing to fully question certain family-member witnesses regarding their memory of the day of the attempted rape. Finally, he argued ineffectiveness based on a failure to call as witnesses several other family members and TKB's boyfriend from the time of the attempted rape, all of whom he claimed would have offered testimony contradicting TKB's description of the day of the attempted rape. The state court granted Becker an evidentiary hearing on his claims.

At the Rule 29.15 evidentiary hearing, Becker presented several witnesses, including trial counsel and the potential family-member witnesses. He also presented a St. Louis police officer against whom TKB had allegedly made claims of sexual abuse, the police officer's wife, and an internal affairs investigator involved with an investigation of possible abuse by the officer. These witnesses did not state that TKB had made claims of abuse. Rather, the officer and wife stated that they had heard

rumors regarding claims against the officer, and the investigator stated that she did not know whether TKB or someone else had made the allegations. Becker did not offer as witnesses several other law enforcement officials, social workers, or medical personnel whom he claimed had knowledge regarding TKB's prior allegations of sexual abuse and her credibility in general. He did, however, offer written reports from several such people. He did not offer testimony from TKB or TRB, and they have not recanted their allegations or trial testimony.

The state motion court rejected Becker's ineffective-assistance claims related to the failure to offer testimony from law enforcement officials, social workers, or medical personnel. The court held that, with no testimony from these witnesses at the Rule 29.15 hearing, the court could not know what the witnesses might have said at trial. Becker argued that the witnesses' written reports and statements provided at the Rule 29.15 hearing sufficiently demonstrated what the witnesses would have said if called to testify. The motion court, however, held that the reports were not self-proving in that they did not clearly show TKB had made prior false allegations of sexual abuse.

The state motion court also rejected Becker's claims related to trial counsel's alleged failure to more vigorously cross-examine the victims as to credibility issues, including the victims' interactions with the witnesses mentioned above, the victims' purported motivations to falsely accuse Becker, and the victims' purported prior allegations of sexual abuse. The state motion court held that trial counsel had adequately cross-examined the victims and that the evidence from the post-conviction hearing did not prove that further or different cross-examination of the victims would have substantially detracted from the victims' credibility or produced testimony favorable to Becker. Regarding Becker's explanation of TRB's purported motive to fabricate accusations against him, Becker argued that TRB was mad at him for not buying her a Notre Dame jacket. Trial counsel explained that he elected not to impeach TRB regarding this purported dispute, or present testimony regarding the

dispute, because he did not believe the dispute was of sufficient gravity to serve as a motive to fabricate such serious allegations. The state motion court rejected Becker's ineffective assistance claim related to TRB's purported motive to lie as a matter attributable to counsel's trial strategy.

Trial counsel explained the general strategy employed at trial. He also explained several of his decisions regarding specific witnesses. As to family members and the events that occurred on the day of the attempted rape, trial counsel stated that he elected to have a witness describe the small house where the attempted rape allegedly occurred to demonstrate the infeasibility of the victim's allegations. He chose this path rather than using the testimony of other family members to contradict specific aspects of TKB's testimony because he did not believe the other family members' testimony would "ring true." Trial counsel stated specifically that the trial occurred several years after the day at issue, and he did not believe a jury would believe that the members of Becker's extended family would have remembered the events of the day so long after the fact. The state motion court determined that counsel's election not to call several potential witnesses to describe these events was a decision within the wide area of permissible attorney strategy.

On appeal, the Missouri Court of Appeals affirmed the denial of post-conviction relief regarding the family-member testimony on the same grounds as the motion court, finding that trial counsel, as a matter of trial strategy, elected not to pursue this testimony. It also affirmed as to the claims of ineffectiveness related to cross-examination of the victims and related to testimony and reports from the non-family-member witnesses. The Court of Appeals went further, however, and provided two additional grounds for denying relief. First, the court held that extrinsic evidence of prior bad acts reflecting on credibility would not have been admissible in Missouri at the time of trial. The court concluded, therefore, that trial counsel's failure to introduce testimony or reports regarding TKB's prior acts and prior false allegations of abuse could not be considered ineffective assistance. Finally, the Missouri Court

of Appeals held in the alternative and as a matter of law that a failure to introduce impeachment evidence can never serve as a basis for Rule 29.15 relief.[4]

Becker then sought habeas relief in the federal district court, asserting twenty-seven claims for relief. The district court denied relief. We granted a certificate of appealability as to six allegations of ineffective assistance: (1) failure to call medical personnel or public officials as witnesses or introduce their reports to establish that TKB previously had made false reports of sexual abuse; (2) failure to call certain family members or TKB's boyfriend and failure to more vigorously question other family members about the events on the day of the attempted rape; (3) failure to introduce evidence that TKB previously had made prior false allegations of sexual

---

[4]This broad statement appears to be an established aspect of Missouri law. See, e.g., State v. Daugherty, 906 S.W.2d 812, 818 (Mo. Ct. App. 1995). In fact, there is language in Eighth Circuit cases suggesting this broad and unqualified rule might comport with Strickland v. Washington, 466 U.S. 668 (1984). See Mills v. Armontrout, 926 F.2d 773, 774 (8th Cir. 1991) ("Generally, trial strategy and tactics 'are not cognizable in a federal habeas corpus proceeding.' We agree that the decision not to attempt to impeach the witness was a strategic one." (internal citation omitted)). We suggest, however, that it is appropriate to limit Mills to its facts and that Missouri's blanket rule may not, in fact, comport with Strickland. Arguably, such a rule could be deemed an unreasonable application of Strickland in cases where impeachment evidence is sufficiently strong and clear, and the witness's testimony is so critical to a conviction, that no reasonable attorney could fail to use the impeachment evidence. In such a case, there is a strong argument that prejudice would be clear. See, e.g., Steinkuehler v. Meschner, 176 F.3d 441, 445–46 (8th Cir. 1999) (holding, in a pre-AEDPA case, that a trial attorney's failure to impeach a critical witness with a strong basis for impeachment merited habeas relief for an Iowa inmate). In general, Strickland is a flexible standard broadly applicable to the full spectrum of attorneys' actions. As such, an attempt to hold, categorically, that ineffectiveness regarding impeachment evidence can never support a Strickland claim may go too far. In the present case, however, it does not matter because, as discussed below, the other grounds that the state courts offered for rejecting Becker's claims are valid and adequate to support the state court's rulings.

abuse; (4) failure to more fully cross examine TRB regarding motives for falsely accusing Becker and failure to impeach TRB regarding testimony that she had not seen Becker since 1991; (5) failure to more fully cross examine TKB regarding the events surrounding the attempted rape, letters she wrote to her sister regarding allegations against Becker, and her purported anger towards Becker at the time of the allegations; and (6) failure to introduce nine specific items of evidence related to the witnesses that counsel elected not to use at trial.

II.     Discussion

Although the certificate of appealability identifies six separate issues, these issues overlap in that some deal with the failure to call witnesses, others involve a failure to introduce statements, reports, or other credibility evidence regarding those same witnesses, and still others relate to a failure to more fully cross examine TKB or TRB as to issues that the unused testimony or evidence purportedly would have addressed.  The overlap between the issues reduces the points that require discussion to five allegations of ineffective assistance based upon: (A) a failure to introduce credibility evidence in the form of reports or testimony from third parties regarding specific past actions bearing on TKB's credibility; (B) a failure to more fully cross examine TRB; (C) a failure to introduce impeachment evidence in the form of testimony or hospital records indicating that TKB had written letters to TRB encouraging her to support TKB's claims against Becker; (D) a failure to more fully cross examine TKB; and (E) a failure to more fully question family-member witnesses, or call as witnesses additional family members and a boyfriend, all of whom purportedly witnessed some of the events on the day of the attempted rape.[5]

_____

[5]Becker also argues that the cumulative effect of the alleged errors establishes prejudice.  Because we hold none of Becker's individual claims of error  amount to constitutionally defective representation, Becker's cumulative error argument is without merit.  Even if we were to deem some aspect of counsel's performance deficient under Strickland, any prejudice analysis would have to be limited to

"We review the district court's conclusions of law *de novo* and its factual findings for clear error." Hunt v. Houston, 563 F.3d 695, 702 (8th Cir. 2009). We may grant a habeas corpus petition under AEDPA only where "the relevant state court decision was either 'contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,' . . . or 'based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" Id. (quoting 28 U.S.C. § 2254(d)(1), (2)). All of Becker's claims assert constitutionally ineffective assistance of counsel under the standard of Strickland v. Washington, 466 U.S. 668, 687 (1984). Counsel is ineffective within the meaning of Strickland if "(1) trial counsel's performance was so deficient as to fall below an objective standard of the customary skill and diligence displayed by a reasonably competent attorney, and (2) trial counsel's deficient performance prejudiced the defense." Armstrong v. Kemna, 534 F.3d 857, 863 (8th Cir. 2008).

A.     Evidence Regarding TKB's Credibility Based on Specific Past Acts

The evidence related to this issue includes reports and potential testimony from public officials reflecting on TKB's credibility and concerning prior false statements and past allegations regarding sexual abuse by a police officer. The evidence also includes TKB's juvenile records and medical records purportedly showing TKB had spoken and written letters to TRB trying to convince her to fabricate allegations against Becker. We address the question of letters from TKB to TRB separately

consideration only of the consequences of the constitutionally defective aspects of representation, not an accumulated prejudice based on asserted but unproven errors as urged by Becker. In Middleton v. Roper, 455 F.3d 838 (8th Cir. 2006), we reiterated the position that only prejudice from actual instances of constitutionally ineffective assistance can support the granting of habeas relief on a Strickland claim. See id. at 851 ("We repeatedly have recognized a habeas petitioner cannot build a showing of prejudice on a series of errors, none of which would by itself meet the prejudice test." (internal quotation omitted)).

below. Regarding TKB's juvenile records, the trial court excluded the details of those records. Trial counsel, nevertheless, discussed in general terms the contents of the juvenile records. As a result, the jury learned about TKB's troubled past and her avoidance of juvenile detention due to the timing of her allegations against Becker. The jury also learned that TKB was a troubled girl with several suicide attempts, hospitalizations, and run-ins with law enforcement and that TKB or her mother had purportedly accused a police officer of sexually abusing TKB. The state courts correctly determined that trial counsel was not ineffective for abiding by the court's ruling excluding the specifics of TKB's juvenile records. Counsel still conveyed the material aspects of those records to the jury as relevant to the general theory that TKB was a troubled girl who fabricated serious allegations to avoid detention.

The potential testimony from officials and the officials' reports would have been extrinsic evidence of TKB's prior bad acts reflecting on credibility but not rising to the level of prior convictions. The state courts determined that the absence of Rule 29.15 testimony from these witnesses precluded relief because Becker failed to prove what their testimony would have been had trial counsel called them to testify. Becker argues the written reports sufficed to prove the content of the missing testimony.

The state courts rightly rejected this argument. The record was unclear as to whether TKB herself or her mother had actually made the allegations. The officer who purportedly had assaulted TKB denied knowledge of the allegations and stated only that he had heard rumors of such allegations. That officer's wife provided similar testimony at the Rule 29.15 hearing. There was an internal investigation regarding allegations of sexual abuse, which started following a referral from other officials, but TKB had not made any allegations to the internal affairs officer investigating the matter. The investigation did not result in any charges against the officer, and TKB denied that any abuse occurred. At trial, the psychiatrist stated that TKB's mother may have been the source of allegations against the police officer. Whether or not this statement by the psychiatrist was true, Becker failed to develop evidence in his post-

-12-

conviction proceedings demonstrating that the psychiatrist was incorrect and that TKB was the source of any such allegations.

Further, and more generally, this evidence and forecasted testimony (with the exception of the purported draft letters from TKB to TRB) was merely credibility evidence unrelated to the allegations against Becker; it was evidence of prior misconduct reflecting on credibility but not amounting to prior convictions. In Rousan v. State, 48 S.W.3d 576, 590 (Mo. 2001) (en banc), the Missouri Supreme court stated that certain records were not admissible for impeachment purposes because the records were extrinsic evidence of prior bad acts reflecting on credibility, and such evidence was not admissible in Missouri's courts. The Missouri Supreme Court later described this rule more completely:

> While a party may cross-examine the witness regarding specific acts of misconduct relating to credibility, these prior acts may not be proven by extrinsic evidence. Thus, when a defendant cross-examines a witness about prior misconduct, the defendant is bound by the witness's answer and cannot offer evidence to the contrary, unless, of course, the character of the witness has been put in issue on direct examination.

State v. Long, 140 S.W.3d 27, 30 (Mo. 2004) (en banc) (internal citations omitted).

Accordingly, although trial counsel was free to cross-examine TKB regarding the alleged prior false reports and alleged coercion of her sister, Missouri law prohibited counsel from introducing the testimony and reports Becker relies upon to prove that TKB was non-credible. The state correctly argues that trial counsel was not ineffective for abiding by the evidentiary rule applicable at the time of trial.[6]

---

[6]Becker correctly notes that the Missouri Supreme Court , in Long, 140 S.W.3d at 30-31, amended the seemingly strict exclusionary rule of Rousan. In Long, the court noted that the rationale behind the exclusionary rule of Rousan was the desire to avoid mini-trials on collateral issues that would arise every time parties attempted

Becker's claim also fails on other grounds. The state's theory of the case was that sexual abuse by Becker had driven much of TKB's delinquent behavior and psychological problems. The state presented evidence to this effect including testimony from the psychiatrist who had treated TKB over the course of several years. Trial counsel's theory of the case was that TKB's behavior and psychological problems were evidence that TKB was untruthful, manipulative, and vindictive and that, as a result, her testimony and allegations were not sufficiently reliable to support a conviction. Given these competing potential views of the case, trial counsel faced a delicate balancing act regarding the issue of TKB's credibility, and trial counsel made its decisions regarding use of the contested testimony and evidence as a matter of trial strategy. See Middleton v. Roper, 455 F.3d 838, 846 (8th Cir. 2006) ("Judicial scrutiny of counsel's performance is highly deferential, indulging a strong presumption that counsel's conduct falls within the wide range of reasonable professional judgment." (quotation omitted)).

---

to prove facts regarding prior bad acts not established by prior convictions. Id. at 30. The court determined in Long that, in certain cases, a witness's testimony might be so vital to the prosecution, and the impeachment evidence so strong, that the strict exclusionary rule had to be amended to include limited exceptions in order to strike the proper balance between giving the jury full exposure to relevant credibility information and preventing inefficient mini-trials on collateral issues. Id. at 30–31. In any event, the Missouri Supreme Court did not decide Long until 2004, long after Becker's 1995 trial.

Given the fact that Rousan was controlling at the time of trial, the state court reasonably applied Strickland, in rejecting Becker's claims of ineffective assistance. AEDPA requires only that state courts apply clearly established U.S. Supreme Court precedent in a reasonable manner, Williams v. Taylor, 529 U.S. 362, 407–10 (2000), and Strickland requires only that trial counsel perform in a manner consistent with that of "reasonably competent attorney." Strickland, 466 U.S. at 687. Here, the Missouri Court of Appeals concluded that trial counsel's failure to attempt to introduce inadmissible evidence comported with the attorney-performance standard of Strickland. This determination withstands our scrutiny under AEDPA.

-14-

B.      A Failure to More Fully Cross-Examine TKB

A separate but related question is whether counsel failed to adequately cross-examine TKB as to the issues referenced above. Even <u>Rousan</u> permitted trial counsel to question TKB as to prior bad acts not established by a prior conviction, and specific similar instances of prior false allegations could be fertile ground for questioning an accuser. Becker's current ineffective-assistance claim based on this theory fails, however, because the evidence of TKB's prior, purportedly false allegations and evidence regarding the coercion or coaching of her sister was mixed and confusing at best. In light of this fact, Becker needed to present evidence at his Rule 29.15 hearing sufficient to show what TKB's answers or testimony might have been had counsel cross-examined her about these issues. Without such evidence, there can be no showing of prejudice as required to prevail on a claim of ineffective assistance. <u>Strickland</u>, 466 U.S. at 691–92.

As already discussed, Becker alleges that TKB falsely accused a police officer of sexually assaulting her. The evidence Becker presented at his Rule 29.15 hearing regarding this issue, however, failed to showed that TKB herself had made any such allegation, and at trial, the mental health professional stated that TKB's mother, and not TKB, had made this prior accusation. Given the uncertainty as to whether TKB or her mother had made this allegation, and the absence of evidence at the Rule 29.15 hearing to prove that TKB had made the prior, false allegation of sexual abuse, Becker failed to establish that trial counsel acted outside the permissible bounds of professional conduct by not questioning her as to this issue. On the present record, the results of different or further cross-examination of TKB are speculative at best. As such, there was no unreasonable application of <u>Strickland</u> in the state court's denial of Becker's claim.

C.     A Failure to Introduce Evidence Regarding Letters from TKB to TRB

We address the draft letters from TKB to TRB separately because, unlike the other documents and records identified by Becker, these letters relate to the facts of the case; they are not merely general background evidence of prior acts purportedly bearing on credibility. Becker did not produce the draft letters from TKB to TRB, and medical records referencing the letters do not make clear what the content of the letters had been. As such, it is by no means certain that the letters reflected an attempt by TKB to induce TRB to falsely accuse Becker rather than mere encouragement to disclose truthful claims of abuse and support TKB in her claims of abuse. In short, the documents Becker presented were not self-proving, and without more evidence or testimony in the Rule 29.15 hearing, it is unknown what, if any, prejudice may have resulted from the failure to introduce these materials.

D.     A Failure to More Fully Cross-Examine TRB

Becker also argues trial counsel should have cross-examined TRB about her anger at Becker for not buying her the Notre Dame jacket and about false trial testimony in which TRB claimed not to have seen Becker since 1991, when Becker claims to have seen her and traveled with her after that time. He also argues trial counsel should have cross-examined TRB regarding letters from TKB and conversations with TKB in which Becker claims TKB asked TRB to make false accusations against Becker. The state courts determined counsel's performance in these areas comported with Strickland, and we agree.

Regarding the Notre Dame jacket, TRB's anger at Becker, and her purported motive to falsely accuse Becker of sexual abuse, we agree with the state post-conviction court that counsel acted well within the scope of reasonable representation in electing not to pursue this line of questioning. The purported basis for TRB's anger was not proportionate to the accusations she made, and trial counsel is not ineffective

for making the strategic decision not to pursue cross-examination as to a theory that he described at the Rule 29.15 hearing as making "no sense." See, e.g., Link v. Luebbers, 469 F.3d 1197, 1205 (8th Cir. 2006) ("Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome." (internal citation omitted)).

Regarding TRB's testimony that she had not seen Becker since 1991, the state post-conviction court held it was not ineffective representation to fail to question TRB about her misstatements. TRB was a child-witness who was upset at the time of trial. Her failure to correctly remember the dates of visits with Becker around 1991 was not of great value in discrediting her testimony or defending Becker against the claims of sexual abuse. As to the counts involving TRB, timing was not an element of the offenses, and as such, the value of further cross-examination on this topic would have been solely related to TRB's general credibility. Counsel in cases such as this may make strategic decisions as to when to continue with cross-examination of upset witnesses and when to terminate questioning due to the perceived limited value of exposing minor inconsistencies in testimony that does not bear directly on the offense.

Regarding cross-examination as to TRB's desire to help TKB, TRB admitted her desire to support her sister, and as such, cross-examination was not absent as to this issue. To the extent Becker argues counsel should have delved into conversations or letters between TRB and TKB, the state court correctly determined that the value of any such cross-examination would be speculative at best. As already discussed, there is no evidence that TKB asked TRB to lie. TRB did state that she did not have an opportunity to speak with TKB between the time when TRB initially denied being a victim of abuse and the time when TRB disclosed the abuse to her mother. The medical records appear to contradict this claim, suggesting that TRB and TKB did, in fact, speak to one another during this time. Without evidence showing that TKB encouraged TRB to lie, however, and without evidence tending to show that TRB's possible misstatement about talking to her sister on a particular date was anything

-17-

more than an innocent mistake, the impeachment value of this statement is limited. The testimony as a whole showed that the sisters were aware of each other's abuse, had confided in each other for years, and were attempting to support each other.

Finally, we note that trial counsel cross-examined TRB about the house where Becker attempted to rape TKB, and TRB provided a response helpful to Becker. In reference to a question about a Christmas in 1987 or 1988 when TRB was present in the house and when TRB alleged Becker sexually abused her, she stated that the house was small and some family member likely would have seen what Becker had done. This cross-examination was consistent with trial counsel's strategy to show the improbability of abuse occurring in the small crowded space. In the context of the trial as a whole, trial counsel was not ineffective in his cross examination of TRB.

> E. Failure to Call Certain Family Members and a Boyfriend as Witnesses and Failure to Question Witness Linda Bays Regarding Events on the Day of the Attempted Rape

Becker alleges that counsel was ineffective for failing to call three of Becker's family members and TKB's boyfriend to describe the events that occurred on the day of the attempted rape. Becker also alleges trial counsel was ineffective for failing to elicit more detailed testimony about that day from a family member who did testify at trial. According to testimony from these witnesses at the Rule 29.15 hearing, they would have stated that TKB and her boyfriend arrived at Becker's mother's house in the late afternoon or early evening approximately one half hour after Becker arrived and that TKB and Becker immediately began fighting. These witnesses claimed TKB and Becker were fighting because TKB had run away from her mother and Becker had refused to let her stay with him, instead ordering her to return home or wait for her mother or an aunt to pick her up. The witnesses testified generally consistently with one another that Becker and TKB's argument started outside, moved inside, and continued in an upstairs room for five to ten minutes until other family members went

-18-

into the room to check on Becker and TKB. TKB subsequently tried to jump out of a window.

The witnesses were inconsistent in their precise descriptions of the amount of time that elapsed between TKB's arrival and her attempt to jump out of the window. In addition, some witnesses' testimony was generally suspect in that the witnesses described TKB as arriving at the home at about 5:30 or 6:00 p.m. and stated that a matter of minutes elapsed before TKB attempted to jump through the window, but they also stated that it was dark or getting dark when she attempted to jump through the window. Counsel noted at the Rule 29.15 hearing that, given the time of the year (July), it would not have been approaching dark until two or more hours later. Counsel also made the point that, with the exception of the boyfriend, these potential witnesses were aligned with Becker in a family divide caused by the allegations against Becker.

According to Becker, the testimony from these witnesses would have shown that Becker did not have an opportunity to attempt to rape TKB, Becker and TKB were fighting about an issue related to TKB's mother and related to Becker refusing to let TKB live with him, and the events of the day were dramatically different than described by TKB (she had testified that Becker had been attempting to touch her "all day"). Becker argued the testimony from TKB's boyfriend would have been particularly helpful to his defense because the boyfriend, unlike Becker's relatives, presumably would have been more inclined to support TKB's version of events rather than Becker's version.

Trial counsel stated at the Rule 29.15 hearing that he did not believe the testimony from these witnesses would "ring true" because he did not think jurors would believe that these witnesses would remember the details of the event several years after the fact (the day at issue was in July 1991 and the trial was in 1995). Trial counsel interviewed and personally assessed the credibility of these potential

witnesses, other than the boyfriend, and made a decision not to call the family-member witnesses based on his own professional judgment and credibility assessment. Regarding the decision not to call the family-member witnesses that counsel actually interviewed, counsel's actions fall within the broad range of performance permitted by Strickland. See Strickland, 466 U.S. at 690 ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.").

Regarding the boyfriend, Becker's argument presents a closer question. Becker argues that counsel failed to interview TKB's boyfriend, and therefore, could not have exercised professional judgment in electing not to call him at trial. The boyfriend testified at the Rule 29.15 hearing that no one had contacted him at the time of Becker's trial. A decision not to call a witness generally does not comport with Strickland if the record establishes that counsel did not actually assess the credibility of the witness. See, e.g., Armstrong v. Kemna, 534 F.3d 857, 864–65 (8th Cir. 2008) ("[S]trategic choices resulting from lack of diligence in preparation and investigation [are] not protected by the presumption in favor of counsel.") (quotations omitted). Here, however, the primary motive for trial counsel's election not to use the witnesses was his belief that jurors would find it incredible that onlookers would remember the particular details of the day four years after the fact. The trial in this case did not occur shortly after the alleged crime, but several years after the fact. Counsel reasonably questioned the general credibility of detailed accounts of a day several years after the fact provided by minor participants. This same rationale applies to testimony from the boyfriend just as it applies to the family-member testimony, even if trial counsel did not interview the boyfriend.

Further, the boyfriend's testimony, even if offered at trial and believed by the jury, would not have precluded the jury from finding Becker guilty. The potential testimony, while contradicting TKB's claim that Becker had been trying to touch her "all day," still left a window of time during which TKB and Becker were alone in an

upstairs bedroom from which family members heard fighting and commotion. Accordingly, even if circumstances surrounding the boyfriend could support a finding of ineffective assistance of counsel, Becker has failed to show prejudice related to this witness. The boyfriend does not claim to have entered the house, and his potential testimony describes his observations from outside the house. His potential testimony is fully consistent with Becker and TKB having had an opportunity to be alone in an upstairs room for a short period of time prior to TKB's attempt to jump through the window.

To the extent Becker urges us to view the impeachment value of the boyfriend's testimony as sufficient to support a claim of ineffective assistance of counsel, we reject his arguments. The boyfriend's testimony would have been of greater impeachment value than the family members' because the family members clearly were aligned with Becker whereas there is no suggestion that the boyfriend was biased in favor of Becker. It would not have been of great impeachment value, however, because TKB herself had not offered a highly detailed description of the day at issue. Rather, she described the abuse, described trying to jump out the window, and only obliquely referenced Becker as having been trying to touch her "all day." We note that all of these potential witnesses testified consistently with one another and with trial witnesses as to the fact that TKB attempted to jump through an upper-story window. The state courts reasonably determined that counsel's performance comported with <u>Strickland</u> when noting that counsel's strategy was based on the likelihood of witnesses remembering such a dramatic occurrence but not necessarily remembering all the details that occurred earlier on that same day. Accordingly, we reject Becker's claims based on counsel's failure to call the family members and boyfriend as witnesses.

We affirm the judgment of the district court.

_____

-21-